Alberta Edelstein CURTIS and Arthur Athens, Appellants,

v.

UNITED STATES of America, Appellee.

No. 18882.

United States Court of Appeals Fifth Circuit.

Dec. 21, 1961.

Rehearing Denied Jan. 22, 1962.

William M. Spanakos, Brooklyn, William C. Wright, Laredo, Tex., John E. Fitzgibbon, Laredo, Tex., for appellants Curtis and Athens.

William B. Butler, Asst. U. S. Atty., Scott T. Cook, Asst. U. S. Atty., Houston, Tex., Woodrow Seals, U. S. Atty., Houston, Tex., for appellee.

Before TUTTLE, Chief Judge, and HUTCHESON and RIVES, Circuit Judges.

RIVES, Circuit Judge.

Upon a jury's verdict, the appellants, defendants, were adjudged guilty under both counts of an indictment, the first charging conspiracy to smuggle marihuana into the United States and to transport and conceal the same in violation of Section 176a, Title 21 United States Code Annotated,[1] and the second charging the substantive offense of smuggling into the United States 100 pounds of marihuana in violation of said section 176a. Arthur Athens (hereafter Athens) was committed to the custody of the Attorney General for a period of 10 years, and Alberta Edelstein Curtis (hereafter Mrs. Curtis) was sentenced for a period of 5 years.

On appeal they insist that there is insufficient evidence to support the convictions, particularly that of Athens, and that various procedural errors require a reversal of the convictions of both appellants.

## I. Sufficiency of the Evidence.

■■ It is well settled that a conviction must be sustained if, taking the view most favorable to the Government, there is substantial evidence to support it.[2]

1. In pertinent part,

"Notwithstanding any other provision of law, whoever, knowingly, with intent to defraud the United States, imports or brings into the United States marihuana contrary to law, or smuggles or clandestinely introduces into the United States marihuana which should have been invoiced, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such marihuana after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or whoever conspires to do any of the foregoing acts, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. For a second or subsequent offense (as determined under section 7237(c) of the Internal Revenue Code of 1954), the offender shall be imprisoned for not less than ten or more than forty years and, in addition, may be fined not more than $20,000.

"Whenever on trial for a violation of this subsection, the defendant is shown to have or to have had the marihuana in his possession, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains his possession to the satisfaction of the jury."

2. Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; Krull v. United States, 5 Cir., 1957, 240 F.2d 122, 137, 138.

That means "whether, taking the view most favorable to the Government, a reasonably-minded jury might accept the relevant evidence as adequate to support a conclusion of the defendant's guilt beyond a reasonable doubt."[3] This is a circumstantial evidence case, and in such cases this Court clings to the test that the inferences reasonably to be drawn from the evidence must be not only consistent with guilt of the accused but inconsistent with every reasonable hypothesis of his innocence.[4] It is, however, important to note, as said in Vick v. United States, 5 Cir., 1954, 216 F.2d 228, 232, that:

> "In such cases the test to be applied on motion for judgment of acquittal and on review of the denial of such motion is not simply whether in the opinion of the trial judge or of the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt, but rather whether the jury might reasonably so conclude."

3. Lambert v. United States, 5 Cir., 1958, 261 F.2d 799, 801; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949.

4. Cuthbert and Busby v. United States, 5 Cir., 1960, 278 F.2d 220; Riggs v. United States, supra.

5. We assume without deciding that, if Athens was improperly convicted, Mrs. Curtis' conviction under the first count charging conspiracy could not stand in the absence of evidence that there was some other conspirator. United States v. Gordon, 3 Cir., 1957, 242 F.2d 122, 125; Cf. Bryant v. United States, 5 Cir., 1941, 120 F.2d 483, 485; West v. United States, 5 Cir., 1947, 161 F.2d 452. See also other cases collected in Note 554, Title 18, § 371, United States Code Annotated.

6. Guevara v. United States, 5 Cir., 1957, 242 F.2d 745, 746, 747; Eason v. United States, 9 Cir., 1960, 281 F.2d 818, 820.

7. "It must have been smuggled knowingly into this country. The defense here, on the part of the defendants, is that the marijuana, which is shown, I think without doubt, to have been in the vehicle which Mrs. Curtis was driving—the defense is that it was placed there by some third person unknown to these defendants, that neither of the defendants either were a party to placing it there and that neither of the defendants knew it was there. The defense theory, as I understand it, is that this was an innocent trip to Texas and into Mexico, and that while the vehicle was out of Mrs. Curtis' possession, while it was in the garage or while some friend or other person was using it, someone else placed the marijuana there, and she, nor the defendant Athens, had any reason to believe there was any marijuana in the car. If you accept that view of the matter, then the defendants would not be guilty of smuggling, nor would Mrs. Curtis have had the marijuana in her possession, even though it was in the car. Because if she didn't know it was in the car, if her version of the matter be accepted to you, then she simply is not guilty. Possession is defined as follows: a person has possession of an object when he knowingly has direct physical control thereof. Hence, as I have stated, if she had no knowledge that it was there, she would not have been in possession of the marijuana. * * · * "

Under the applicable test, there is no serious insistence on the insufficiency of the evidence to support the conviction of Mrs. Curtis under the second count, the substantive offense.[5] In the automobile which she drove from Mexico across the International Bridge into Laredo, Texas, the customs agents found, stuffed horizontally between the springs of the rear seat and concealed in the left front and left rear door panels, 181 packages each containing approximately 8 to 9 ounces of marihuana. If the jury could reasonably conclude that her possession of that marihuana was a knowing possession, then that evidence was sufficient to authorize her conviction unless she explained that possession to the satisfaction of the jury. 21 U.S.C.A. § 176a, quoted in n. 1, supra.

■ "Possession" must, of course, be a knowing possession.[6] The statute itself requires that the smuggling be done "knowingly." 21 U.S.C.A. § 176a. The learned district judge charged the jury in clear and explicit terms to that effect.[7]

■■ The circumstances were such that the jury could properly conclude beyond a reasonable doubt that Mrs. Curtis knew that the marihuana was hid in the car which she was driving. Further, under the evidence, the jury could reasonably find that Athens, though not present, was guilty as a principal of the substantive crime,[8] and that he and Mrs. Curtis conspired to commit that offense. Because some difference of opinion exists among the judges of this Court, the evidence will be reviewed in some detail.

Mrs. Curtis confronted the customs agent at an unusual hour, 1:00 A.M., professing to be in a hurry to get to her room in a hotel because of a most embarrassing accident, she had wet herself and the front seat of the automobile. One of the customs agents was about to pass her when another happened to place his hand on the rear seat of the car, and to notice that it appeared to be unusually stiff. Lifting up the seat then disclosed packages of marihuana about 8 inches long and about 3 inches in diameter stuffed between the springs. A check of the door panels resulted in the discovery of additional packages of marihuana.

Mrs. Curtis denied knowledge of the marihuana. One of the agents testified:

"Mrs. Curtis said that she and her husband had left New York City on the 28th, and that they had flown to San Antonio, and that in San Antonio she had rented a vehicle. The vehicle was then at the International Bridge. She said that she and her husband then came to Laredo, Texas, and that her husband had business in Laredo and remained in Laredo; that she had decided to go to Monterrey and visit some friends. I asked her who her friends were in Monterrey, and she declined to identify them. I then asked her where her husband was at that time, and she said she supposed he was back in New York, that

he had not planned to wait for her return from Monterrey."

While questioning Mrs. Curtis, the customs agents looked through her purse and found several paid bills and meal tickets from Hotel Rio, Monterrey, Mexico, which were introduced in evidence. The bills and meal tickets were in the name of "Helen Ward," and Mrs. Curtis readily admitted to customs agents that she had used that name in Monterrey. In registering at the hotel there she had also given an erroneous address for her residence in New York. The meal tickets showed that three people had eaten at a particular table on the preceding day, October 31, and that the meals and refreshments had been charged to the room occupied by "Helen Ward." The other meal tickets were for "Helen Ward" alone. The bills disclosed four long distance telephone calls made to the occupant of Room 910 of the Plaza Hotel in Laredo, Texas.

The customs agents reached the Plaza Hotel by 2:00 A.M. The occupant of Room 910 proved to be Athens, though the registration for the twin bedroom was in the name of "Mr. and Mrs. Artie Curtis." At that hour, Athens was not in his room, but was drinking coffee in the nearby Southland Cafe. The agents had coffee with him, and placed him under arrest. They then advised him that he was not required to answer any questions, and that, if he did, his answers could be used against him. The following conversation ensued:

"A. We asked Mr. Athens his name. He stated his name was Arthur Athens. He said he lived in New York, and that he had flown down by himself to Laredo, and that he was staying at the Plaza Hotel. He stated he was visiting friends at the Hamilton Hotel. He identified these friends as the Wilsons. I then told him that we would check the Hamilton Hotel to see if anyone had registered there under the name of Wilson; and that we knew

8. See 18 U.S.C.A. § 2.

he was registered as Artie Curtis at the Plaza Hotel; and that we had Alberta Curtis at the International Bridge in possession of marihuana.

"Q. Did he say anything at that time? A. He said he didn't know anything about it at that time. He identified Mrs. Curtis as a friend of his employer—I mean a wife of his employer.

"Q. Did he state to you whether he was the Artie Curtis that had registered at the Plaza Hotel? A. He admitted that they had registered there as Mr. and Mrs. Artie Curtis.

"Q. What did you do after that, Mr. Morgan? A. When we finished our coffee, we went over to the Plaza Hotel, where he picked up his luggage and checked out, and then we went to the International Bridge.

"Q. What did you do when you got to the International Bridge? A. We first took Mr. Athens into where Mrs. Curtis was. We asked if this was her husband, and she said it was not, but that he was the man that had come from New York with her.

"Q. Did you then question Mr. Athens again, or did you question either one of them again after that? A. We then questioned Mr. Athens and obtained a personal history statement from him, and went into more detail on his activities.

\*　　\*　　\*　　\*　　\*

"A. Mr. Athens stated that he was employed in New York at a brewery, and also as a car salesman for Mrs. Curtis' husband, Art Curtis, and that the Curtises had asked him to come down to—or actually, to go to Monterrey with Mrs. Curtis; and that he told them that he would not go to Monterrey, but that he would go to Laredo; and that Mrs. Curtis' husband had bought their plane tickets to go to San Antonio; and that after they had arrived in San Antonio, Mrs. Curtis had rented

an automobile, and they had then come down to Laredo, where they had checked into the Plaza Hotel; and that the next day, Mrs. Curtis left for Monterrey, and he had stayed here in Laredo to wait for her to return.

"Q. Did he tell you how he expected to get back to New York? A. We asked him how he was going back to New York, and he said they planned to fly. And we told him then that Mrs. Curtis had only $44.-00 in her possession, and how was she going to get back. He stated that he would buy her ticket back to New York.

"Q. Did you make a demand on either one or both of these defendants for the order form? A. I made demand on Mr. Curtis—I mean—pardon me. Mr. Athens. And Customs Agent Rody made demand, in my presence and the presence of Agent Glenn, on Mrs. Curtis, and neither were able to produce the written order form.

"Q. Did you subsequently have occasion to talk to Mr. Athens? A. I did, I talked to Mr. Athens and Mrs. Curtis. I don't recall the date. It was the day they made bond here in Laredo, Texas.

"Q. Approximately how many days was that after the first, do you recall? A. It was—let's see. The first, I believe, was a Tuesday, and this was a Saturday, which would make it the fifth, I suppose.

"Q. November the fifth? A. Fourth or fifth.

"Q. Did the defendant, Athens, tell you anything at that time? A. We met at the Southland Cafe and had coffee, and I again told the two defendants that they did not have to answer any of my questions, but I wanted to clear up a couple of points. I asked him what name he had used when he flew down from New York, and he said he had gone by the name

of A. Dale. He said Mr. Dale was a friend of his in New York."

Mrs. Curtis testified as a witness in her own behalf and in behalf of her co-defendant Athens. According to her testimony, she was 25 years of age, worked as a professional model in New York City, and in that profession used various names, such as, "Helen Ward," "Bobbi Evans" and "Barbara Curtis." It is customary for professional models to use different names. In August 1959, some fifteen months before her arrest, she was married to Arthur Curtis, a prominent used-car manager. Within a month after their marriage, she met the defendant Athens. Her husband brought Athens to their apartment. Athens and her husband are like brothers, and "He (Athens) couldn't be closer to me than a brother. I refer to him as such upon introducing him, even." Accumulating the nights, Mrs. Curtis would say that Athens had spent five months out of the year sleeping on the couch in the living room of the Curtis' apartment; " * * * my husband leaves at 7:30 in the morning, and Mr. Athens doesn't go to work until 3:00 o'clock in the afternoon. There is never any qualm about my husband going to work and * * *." During the year she had seen Athens on an average of once a day. When she met him, Athens was employed as a beer tester by the F & M Shaffer Brewing Company. Athens suffered from mononucleosis and took sick leave from his employer due to this illness. He then worked for her husband on a commission basis selling automobiles. She still saw Athens each day during the six weeks or two months before they left for the trip to Mexico.

The customs agents were never able to find the friends Mrs. Curtis had visited in Monterrey. According to Mrs. Curtis, those friends were Nora and Frank Wilson. They were not registered at the same hotel as Mrs. Curtis, and she had not heard from them since that visit. Nora had been a fellow model with whom Mrs. Curtis had formed a friendship in her profession.

"Q. But you were close friends? A. No. No. Friendship is a—sometimes when people have something in common, they naturally will call it friendship. Nora and I didn't really socialize, but we constantly met each other in the cycle of our business, and sometimes we found ourselves booked on the same job together and we went to lunch together. This, I consider a friend. It was closer than an acquaintance, but it wasn't a dear friend."

Mrs. Curtis had never before visited Nora, knew nothing of her background, and they had no mutual friends through whom Nora could be located. She met Nora by accident at lunch in a New York restaurant:

"We were very excited to see each other. It had been a long time, and we sat down and had lunch together. We just discussed various things. I told her I had gotten married. She told me that she had married quite well, a gentleman named Frank Wilson. He was a saxophone player who had given up the instrument to do arrangement work, and she was doing extensive traveling. I had told her that my husband and I were planning a vacation. We hadn't had one in well over a year and a half, and I had been run-down, not feeling too well. And we had been discussing taking a vacation. As to when and where, we had come to no decision. And she said that—she told me that she was going to California and on into Mexico, and it would be a wonderful idea if we could all get together. And I told her that it was impossible for me to give her any decision. I would definitely have to discuss it with my husband. She said that it would be a nice way to see the country. We could rent the car and travel. It was great. She was having a wonderful time doing it herself, and that I couldn't possibly get in touch with her, so she took my telephone num-

ber and said she would be in touch with me.

\*    \*    \*    \*    \*

"\* \* \* It was about two weeks later that I got a phone call from California, and she had asked me what my plans were, if I was going to follow her suggestion and if we were coming down there, and I told her that my husband was unable to go, but I was pretty sure I could convince him to let me go. So she said that she would make reservations for me at the Rio Hotel in Monterrey. She was going to be down there the weekend of the 28th, and she asked if I thought I was coming down by car. I said that was undecided; I didn't know at that point. Well, that ended that conversation. And again my husband got skeptical, and he said that he wasn't too sure it was a good idea for me going all that distance to these people, this Nora and her husband. He didn't know them, and it was a lot of mileage between New York and Mexico, and he didn't want me to go. Well, there was dickering back and forth, and it was about 4 or 5 days before I actually left, that my husband came up with the idea that Arthur, Arthur Athens should accompany me down there."

Mrs. Curtis admitted telling the customs agent that she did not know whether her husband was still in Laredo or not and said that, while untrue, that statement was made from sheer fright.

"And I had checked into a hotel to take care of somebody who was not my husband, and had checked in as Mr. and Mrs., and I lied. I readily admit it. I was too frightened to do anything else."

Mrs. Curtis explained wetting herself as follows:

"I made a very sad mistake in leaving at night, I can tell you that. The roads are treacherous. It was frightening because it was so absolutely pitch dark. By the time I

had gotten to the portion of the drive which encircles the mountain —I must assume it circles it, but it is quite a scary, treacherous drive. I was scared to death. I proceeded as cautiously as possible, but it was still very frightening. And I drove all the way. And I was afraid to get out of the car and stop any place, be it along side of the road or into any of the very few restaurants, if I can call them that, on the road. And so, unfortunately, I had an accident. Quite an embarrassing one. Nothing fatal, but nevertheless quite embarrassing one."

In San Antonio, in accordance with a reservation made from New York, Mrs. Curtis had rented an automobile from the Hertz Rental Agency to go into Mexico and return. A $250.00 deposit was required. When Mrs. Curtis had only $200.00, she left the agency a short time and returned with Athens, who put up the additional $50.00.

According to Mrs. Curtis, Athens had been ill on the trip to Laredo. "By the time we got to Laredo, he was just feeling awful, and he looked awful too. I was kind of worried. He had had these attacks before, but I was still very frightened about it. And I said, 'We had better check into a hotel.' And then I came up with the brilliant idea that we should check in as Mr. and Mrs., so I could be as close to him as possible and do what I could for him. So we used my name, Mr. and Mrs. Art Curtis. We went up to the desk clerk, and Artie requested a room with two single beds in it, and the clerk said that he had one, and he gave us the room, and we went upstairs. Mr. Athens got in his bed, and I suggested that we get a doctor, but he didn't want one. He said that it would pass, so I put a cold compress to his head and made him as comfortable as I could, and he fell asleep. And after he fell asleep, I went into the bathroom and got undressed and into my pajamas and bathrobe, and I went to bed."

Mrs. Curtis' husband testified, "\* \* \* defending not only his honor but her

honor." He had made the arrangements for his close personal friend to accompany his wife on this vacation trip. He had made the plane reservation for Athens in the name of "Arthur Dale." "Well, it sounds a little foolish now, but at the time—people that know us in New York know that my relationship with Artie Athens is probably closer than brothers. I don't know why, but at the time I thought that if anybody had seen the passenger list, they might associate some wrong doing, which I knew there was nothing going on, so I just picked a name out of the air and made the reservations that way." He had furnished the money for the trip, and gave Athens $500.00 and his wife either $200.00 or $225.00. According to both Mr. and Mrs. Curtis, the plan was for Athens to accompany Mrs. Curtis into Mexico. Mrs. Curtis testified that Athens' illness required him to remain in Laredo. According to Athens' statement to the customs agents: "He said that he had told Mr. Curtis that he would go as far as Laredo, Texas, with Mrs. Curtis, but he would not go into Mexico with her. We asked him why he told Mr. Curtis that he *wouldn't go into Mexico*. He said that he didn't want to."

Athens did not take the stand.

The Government undertook to rebut parts of the testimony of the Curtises. They had both testified that, notwithstanding their almost constant association with Athens, they had never heard of him making an earlier trip into Mexico. In rebuttal the Government showed that on August 5, 1960, Athens had rented an automobile in San Antonio for a trip into Mexico, had kept the car until August 9, during which time he had driven it 1037 miles.

The defense theory was that some other person had hid the marihuana in the Hertz rental car. In support of that theory, they showed that a tag on the car keys showed that the car was No. 19 of the Hertz Rental Agency at San Antonio, and that the Rio Hotel in Monterrey is also a Hertz Agency. While in Monterrey the automobile stayed in a parking area exposed to the open street, and was loaned on several occasions to Mr. Wilson. The defense theorized that either Wilson or some other person hid the marihuana in the car, hoping to re-rent it from the Hertz Agency in San Antonio and to recover the marihuana. There is, of course, a possibility that that theory is true, but whether so or not was for the jury to decide. We think it unnecessary to detail the circumstances further in order to demonstrate that the jury could reasonably believe beyond a reasonable doubt that Mrs. Curtis and Athens were engaged in a joint enterprise, and that each of them was guilty under both counts of the indictment.

## II. Claimed Procedural Errors.

■ Of the procedural errors relied on for reversal, only two have enough substance to warrant discussion. The first concerns the district court's denial of the defendants' motion for mistrial under the following circumstances. Both of the Curtises had testified that there was no occasion to connect Athens with the use of marihuana. In rebuttal the Government introduced Francis Ahern, a detective in the narcotics bureau of the New York City Police Department, and showed that he had a conversation with Athens on or about November 30, 1960. "Q. And was anything said in that conversation concerning Athens' use of marijuana? A. There was.".

At this point the objection of the defendants that this was not proper rebuttal testimony was sustained. The defendants did not move to exclude the single question and answer, or for precautionary instructions, but did move for a mistrial. The district court denied that motion.

Outside of the presence of the jury, the United States Attorney stated to the court what he expected the witness' testimony to be:

"As I understand, the witness will testify that, in this conversation, Athens told him that he had been smoking marijuana for three or four months, which would have covered

the period of time involved in this conspiracy count and the subsidive (sic) account here. Clearly, the matter would have been admissible in the case in chief, but I think it is also proper rebuttle (sic) testimony in view of the statements from the witness stand of the defendant Curtis and of her husband, that they were closely connected with the defendant Athens, so closely that they saw him every day, and he was closer than a brother; that they knew nothing about his use of marijuana, and that the only purpose for this trip of coming to Texas was for Athens to accompany Curtis on the trip. This shows that there is another motive, and therefore rebuts their statements."

The court could, we think, have exercised its discretion to admit this testimony. When it had sustained the objection of the defendants, it certainly did not have to go further and declare a mistrial.

█ At the conclusion of the evidence the court inquired whether counsel were prepared to argue, and after the United States Attorney had answered in the affirmative, stated: " * * * You may go forward." The following then occurred:

"Mr. Cook [Assistant United States Attorney]: Thank you, your Honor. Ladies and gentlemen, we have been here almost a day and a half now.

"Mr. Wright [Defendants' attorney]: Your Honor, I'm sorry, I understand the arguments—I apologize for interrupting counsel, but we intended, and overlooked making the request to open and close the arguments because of the burden of proof imposed on us, which the court will impose in the charge. The defense requests the right to open and close.

"The Court: And why do you request the right to open and close?

"Mr. Wright: For this reason, your Honor. The court will instruct the jury as to the portion of Article 176–A as to possession. As the court knows, that statute shifts greatly the burden of proof, at least on one of these defendants, and we understand there is no mention in the rules of criminal procedure as to who opens and closes. We believe the common law prevails, and under the law, the person who has the burden has the right to open and close. We request that at this time.

"The Court: It would be necessary, it seems to me, for you to even approach the application of that rule for you to make some very damaging admissions, Mr. Wright, on behalf of your clients. And as you have two clients and not one—

"Mr. Wright: The government has elected to try the persons in one indictment. We believe that, under the law, we would have the privilege and the right.

"The Court: I will deny the motion.

"Mr. Wright: Note our exception."

The appellants now argue that the judgment must be reversed because of the court's statement that, "It would be necessary, it seems to me, for you to even approach the application of that rule for you to make some very damaging admissions, Mr. Wright, on behalf of your clients. And as you have two clients and not one—." It does not appear that that statement was even objected to at the time it was made. If there had been any objection, the court possessed ample power to remove from the minds of the jurors any possible harm caused by the statement. Certainly the statement does not constitute plain error necessitating a reversal under Rule 52(b), Federal Rules of Criminal Procedure, 18 U.S.C.A. We find no reversible error in the record and the judgments of conviction are

Affirmed.