Benjamin COHEN, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 22505.

United States Court of Appeals
Fifth Circuit.

July 21, 1966.

Rehearing Denied Aug. 24, 1966.

Jacob Kossman, Philadelphia, Pa., James J. Hogan, Miami Beach, Fla., for appellant.

John B. Jones, Jr., Acting Asst. Atty. Gen., Richard Buhrman, Atty., Dept. of Justice, Washington, D. C., William A. Meadows, Jr., U. S. Atty., Miami, Fla., Meyer Rothwacks, Joseph M. Howard, Attys., Dept. of Justice, Washington, D. C., Richard M. Roberts, Acting Asst. Atty. Gen., for appellee.

Before WISDOM and COLEMAN, Circuit Judges, and HUGHES, District Judge.

COLEMAN, Circuit Judge:

Appellant was indicted, on two counts, for attempting to evade and defeat income taxes due and owing by him and his wife for the years 1960 and 1961 in violation of 26 U.S.C. 7201.[1] The case was submitted to the Court, without a jury, in a trial which lasted fourteen days. Mr. Cohen was acquitted as to 1961, found guilty as to 1960, and sentenced to fine and imprisonment.

We are of the opinion that the conviction must be affirmed.

The prosecution was grounded on an alleged understatement of gross income. For 1960, appellant's return reflected a gross income of $43,941.53 and taxes owing in the amount of $16,745.74. The government contended, and the Court found, that appellant's gross income for that year was, in fact, $78,441.53, with resulting tax liability of $38,029.21. The $34,500 understatement is attributed to a business transaction from which appellant admittedly received payments totalling $60,000 in currency, but which he claimed was contractually due to be shared by two other men, Edward G. Rosenbaum and Charles S. Tobin.

I

The issues in the case are preponderantly factual. Sixty-one witnesses testified, 144 exhibits were received, and the transcript ran to 2871 pages. In view of the finding of guilt, we must consider the evidence in the light most favorable to the government, Chastain v. United States, 5 Cir., 1956, 237 F.2d 422; Rickey v. United States, 5 Cir., 1957, 242 F.2d 583; Walker v. United States, 5 Cir., 1962, 301 F.2d 94; Mount v. United States, 5 Cir., 1964, 333 F.2d 39, cert. den. 379 U.S. 900, 85 S.Ct. 188, 13 L.Ed. 2d 175; McDaniel v. United States, 5 Cir., 1965, 343 F.2d 785.

Mr. Cohen testified that he paid Rosenbaum $30,000 of the proceeds. Rosenbaum gave Cohen a written receipt for that amount. Moreover, he filed an income tax return admitting receipt of the money, but did not pay the taxes. The government contended that both the receipt and the return were false. This was the key factual issue.[2] On circum-

---

1. "Attempt to evade or defeat tax—Any person who wilfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution."

2. In his opening statement, counsel for the Government stated, "Now, if in fact the defendant Cohen did pay Rosenbaum $30,000 in the year 1960, and if in fact the defendant Cohen did pay Tobin $10,000 in the year 1960, the Government has no case, the ball game is over, and he wins on Count 1."

stantial evidence, the trial court found against the appellant.

There were other factual issues, however, and a recapitulation of the basic evidentiary elements is indispensable to an understanding of the appeal.

Late in the year 1959, in Miami Beach, Charles Tobin and Edward Rosenbaum had a brief conversation about the mortgage loan business. Rosenbaum stated that he had a "source" for mortgage loan money but was not able to find borrowers. Tobin said that he knew of someone in Maryland who might want a loan. Rosenbaum stated that Mr. Cohen, now the appellant, had pension fund sources for mortgage money. Tobin requested Rosenbaum to arrange an appointment. Within a day or two, Rosenbaum, Tobin, and Cohen discussed the matter in a meeting at Cohen's office. Tobin's interested borrower was Samuel Eig, a financier and real estate developer in Silver Springs, Maryland. In early 1960, Eig and Cohen succeeded in arranging a loan for one or more of Eig's motel projects in the amount of $2,350,000. During the early negotiations between the two it was agreed that the brokerage commission on the deal was to be six percent of the amount loaned. When Eig suggested that the brokerage fee should be made the subject of a written contract, Cohen replied that a written contract was not necessary at that time.

On February 25, 1960, appellant made the first collection on the brokerage fee by sending his employee and trusted friend, Howard Morris, to Eig's office in Silver Springs, Maryland, to pick up the money.[3] At Cohen's request this installment amounted to $41,000, with a check being written for $11,000 and the remaining $30,000 being paid in currency in the form of three hundred $100 bills. Two of Eig's associates were present in the Silver Springs office when the cash was delivered,[4] and after Morris' return to Miami Beach appellant called Eig and complained about the "delegation" present when the currency was picked up.

On March 8, 1960, Morris again made the trip to Silver Springs, and the second installment on the commission was collected. On this occasion he received cash in the amount of $30,000, and again refused a request to give a written receipt. The third payment, a check for $5,000, was mailed to Cohen the next day.

Appellant employed a bookkeeping system whereby his secretary entered receipts and disbursements in appropriate journals. His cash receipts journal for the period reflected the payments by check, but no entry was made as to the $60,000 cash.

In January, 1961, appellant called McKeever, a business associate of Eig's, to discuss the remainder of the fee due on the brokerage commission. During the conversation he inquired as to how the $60,000 cash payments were carried on Eig's books. An immediate answer was not given, but McKeever wrote the next

---

3. In dispatching Morris for the money, appellant wrote the following letter, hand carried by Morris and delivered to Mr. Eig:

"Law Offices of Ben Cohen,
420 Lincoln Road, Miami
Beach, Florida
February 25, 1960

"Mr. Sam Eig, Silver Springs, Maryland.

"Dear Mr. Eig: The bearer of this letter, Mr. Howard Morris, is a very dear friend of mine and you have seen him in my office on many occasions. I am taking the responsibility that you give him the package that you have for me and that it will be delivered to me. You are also authorized to turn over the check you have made payable to me. This letter will suffice as a receipt. Any courtesies you may extend to Mr. Morris will be appreciated by me, as he is my dearest friend.

"Most sincerely, Ben Cohen."

4. Morris refused to give a receipt for the cash and immediately after his departure those present, Eig, Shearin, McKeever, and Lawrence Eig, Jr., wrote and attested the following note on the bottom of the letter received from appellant:

"2/26/60. Note: Package referred to above contained $30,000 in cash, the amount of which was verified in my presence by the recipient, Mr. Howard Morris."

day indicating that Cohen had received $63,000 in cash and $16,000 by checks.[5]

Approximately ten days later, McKeever went to Miami. Shortly after arrival he called the appellant, who, immediately after answering the phone, asked McKeever if he had been contacted by the FBI. McKeever replied that he had not, and the appellant informed him that they would talk about it the next day. As scheduled, the parties, along with Eig and Tobin, met in appellant's office. The letter was brought up at once, with appellant complaining about the $33,000 figure and the mention of cash payments. The $3,000 mistake was acknowledged, but appellant continued to complain about the mention of cash payments, and demanded that all copies of the letter be destroyed. Another inquiry was made as to how the payments were reflected on Eig's books. When informed they were probably posted as cash disbursements in payment for brokerage fees, the appellant exclaimed that "this could not be allowed to stand". He then went on to tell those present that the normal method for handling a transaction of this nature was "to cash checks in small amounts, and accumulate the cash in a safe deposit box". Thereafter the appellant stated that McKeever was going to have to declare part of the brokerage fee on his return. A heated exchange took place and the meeting broke up.[6]

---

5. Appellant's exhibit of the letter indicates one of the cash payments to have been in the amount of $33,000 which would indicate a cash disbursement of $63,000, however, the party who authored the letter testified this to be error and that he penciled through the $33,000 amount on the file copy and entered $30,000.

6. McKeever's testimony about this meeting justifies its inclusion in this footnote:

"Mr. Cohen then asked me why I stated in the letter that the two sums of $30,000 had been paid to him in cash.

"I said, 'I thought this was what you had asked me for, a detailed breakdown of all the payments.'

"He said, 'Indeed not. I wanted no mention of cash,' and he demanded me that all copies of this letter be destroyed.

"I made no reply to this demand. At that point, Mr. Cohen, with some heat and agitation, asked me how our books showed the payment of these two $30,000 payments in cash.

"I said I hadn't made a personal examination of our books, that normally our auditors posted the books from the cash disbursement records obtained from checkbook stubs. However, I did tell him that I presumed and was fairly confident that the books would show these payments to him as a brokerage fee and that they must show this in order to be properly deductible as an expense to our corporation.

"Mr. Cohen then states, 'This cannot be allowed to stand.'

"We had a general conversation at this point which was somewhat heated about this matter, and I said I knew of no other way to handle a cash expense disbursement of the corporation other than showing in the books what it actually was.

"Mr. Cohen then said he assumed that we had enough intelligence to know how to handle it, I said, 'I dont know what you are talking about.'

"At that point, Mr. Cohen said, 'Well, the normal method is to cash checks in small amounts and accumulate the cash in a safe deposit box,' and I was fairly stunned at this, and I don't recall making any particular comment about that.

"Mr. Cohen next turned to Mr. Charles Tobin and said, 'Charlie, what income tax bracket are you in?'

"Mr. Tobin looked a little shaken and did not answer him. Mr. Cohen continued to be more and more agitated and turned to me in a rather rude and violent manner and said, 'John, you are going to have to declare some of this on your income tax return.'

"This made me very angry, not only the statement itself, but the manner in which it was said. I was extremely shaken, because prior to this time I had known Mr. Cohen as a very fine gentleman, a man well endowed with all the social graces, who I had found to be a very pleasant person, and this sudden change in his temperament was a shocking thing to me, and I got angry and got out of the chair and I said, 'Mr. Cohen, I am not going to have any discussion that might be construed as a conspiracy.'

"Mr. Cohen said, 'What do you mean by 'conspiracy?'

"I said, 'You as an attorney should know better than I.'

"Then Mr. Eig got up. He knew I was quite angry. He said, 'Come on John, let's go,' and we left the room."

Later, several meetings took place, during the course of which the appellant expressed concern about the FBI investigation and offered to substantially increase the share of the brokerage fee to be paid to Tobin. At one such meeting, Tobin's son, an attorney, was retained by the appellant (on the promise of a $5,000 fee) to draw up a contract to cover the arrangement and distribution of the brokerage commission. The agreement, to be back-dated to the time of the original loan contract, was to indicate that the money was to be distributed as follows: $25,000 to Tobin, $15,000 to Rosenbaum, and $36,000 to the appellant. This proposed contract was taken to Eig, in Maryland, who refused to sign it. A substitute was then drawn, indicating that a commission of six percent, less service fees and appraisal charges, was to be paid to Cohen. There was also a clause that the broker could employ or act in concert with others, but no specification was made as to distribution of the funds to anyone other than the appellant. On receiving Eig's proposed contract, appellant became violently disturbed [7] over the provisions providing for the appraisal and pension fund deductions as well as the omission of a clause indicating distribution of the money to Rosenbaum and Tobin in addition to himself.

In 1960, appellant paid Tobin, as a part of his share of the brokerage commission, two cash installments amounting to $5,500. In 1961, he made a cash payment of $4,500. Just prior to the payment of the $4,500 appellant gave Tobin a check written for this amount and requested that he hold it for a few days to give appellant an opportunity to redeem it for cash. Redemption was made, and at the time Tobin received the $4,500 in cash he signed a back-dated receipt indicating receipt of $10,000 in cash from the appellant as his share of the brokerage fee.

In March, 1961, when appellant's accountant was in the process of preparing Cohen's 1960 return, he learned for the first time that there was an additional $20,000 item, not shown on Cohen's books, to be included in the income tax return for 1960. This item was explained as being a part of the commission fee from the Eig transaction, along with the $11,000 and $5,000 items which were already reflected on appellant's cash receipts journal. In answer to the accountant's request for supporting memorandum on this figure, the appellant produced the contract agreement between him and Eig and two signed receipts—one from Rosenbaum indicating he had received $30,000 and the other from Tobin for $10,000.

Rosenbaum was jointly indicted with Cohen as an aider and abettor. His case was severed. Neither side called him as a witness at the trial.

Appellant testified that he had paid over the $30,000 and $10,000 to Rosenbaum and Tobin respectively. He produced their signed receipts indicating they had received the money, along with their tax returns which reflected that both had reported the same as income for the year.[8] He explained that Rosen-

---

7. Tobin described Cohen's reaction in the following testimony:

"A. Mr. Cohen was very much disturbed by this contract being sent to him in lieu of receiving the original draft which my son had prepared, and he became so violent that he took the contracts and actually crumpled them in his hand and threw them, either on the floor behind his desk or in the waste paper basket, and started a tirade that Eig wanted everything done his way and that again, that he wished that he had never seen the deal.

"Everyone connected with it was referred to individually as an "SB," and so on and so forth, including myself and Ed Rosenbaum, and so forth.

"Finally he seemed to come out of this rage and he became normal again.

"Previously before this transaction I had known him as a very nice individual, not given to rages, but through this and that—that was a typical example of his rage, which was absolutely unexplainable to me, but he finally signed it, and that was that."

8. Tobin later filed an amended return indicating receipt of only the $5,500 payment in 1960.

baum had wanted his share of the proceeds in cash and it was for this reason that payment in currency was requested. He could give no explanation as to why he had demanded all $60,000 in cash since Rosenbaum alone wanted currency. As to his portion of the first installment, which allegedly amounted to $7,500, he testified that it was placed in a box in the attic of his home and kept there until spent for various items.

Rosenbaum was not called as a witness, so it was essential to prove circumstantially the part he played in the tragedy. The government's proof established that Rosenbaum really played a very minor role in the business and legal transactions. He arranged an appointment between Tobin and Cohen, and this was his contribution. He had no influence with the Teamsters Pension Fund, attended no more than one meeting with the interested parties, and on one occasion was described by appellant as a "deadbeat, who borrows from everybody he can". It was shown that in 1960, at the time Rosenbaum allegedly received the $30,000 he owed some $35,000 in back taxes, going back to 1951, none of which was paid in 1960 or within three years thereafter, despite attempts to collect. He was in debt to many and made no payments on these outstanding obligations. He made no payments on outstanding medical bills amounting to $3,750. A $1,200 judgment against him was uncollectible. The trial judge described Rosenbaum's condition as "penurious".

The unpublished memorandum opinion of the Trial Judge consumes eighteen printed pages of the appellate record. Quoting a portion of the findings, he stated as follows:

### A

"The Court does not believe that Rosenbaum received $30,000 or any substantial portion thereof during the year 1960."

### B

"Furthermore, the Court does not believe that from the outset it was a part of the oral agreement that Eig would pay a brokerage commission jointly to Tobin, Rosenbaum, and the defendant."

### C

"I find no substantial credible evidence which indicates that there was a partnership among defendant Cohen, Charles Tobin, and Rosenbaum to pay the brokerage commission paid by Eig."

### II

Appellant assigns the following grounds for reversal: (1) the conviction is not supported by the evidence; (2) the admission of evidence concerning Rosenbaum's financial condition was erroneous; (3) by indicting Rosenbaum the government illegally deprived appellant of a vital defense; and (4) the denial of the motion for a new trial was error.

1. Is the conviction supported by substantial evidence? We think it is. We are well aware, however, that we here encounter a rare situation. Rosenbaum did sign and deliver a receipt for the $30,000. He did make and file an income tax return for the year 1960, in which he again admitted the receipt of the money. He did not appear in Court and did not repudiate these documents. On the other hand, appellant testified under oath that the receipt was genuine and that he did pay the money. No witness, of his own knowledge, directly testified either that the receipt was false or that the money was not actually paid. This gave rise to the argument of counsel, strongly urged at the Bar of this Court, that there was absolutely no evidence at all, substantial or otherwise, to support the finding of the District Judge that the receipt was false and that the money was not paid.

The trouble with this contention is that the immediately preceding facts constitute only a small part of the entire evidence in the record. It was the duty of the trial court to weigh and consider all the proof. He could not, and should not, be limited to any special feature of the evidence. As has often been said in other cases, he did not have to consider Rosen-

baum's receipt and income tax return "in a vacuum".

Rosenbaum, although physically available, was not called by government or defense to confirm or deny that he received the money. We shall say more of this at a later point in this opinion with reference to Rosenbaum's status as a co-indictee, whose case had been severed and who was not then on trial.

We realize also that the conviction of a man on the theory of non-payment at a time when he stands armed with a written receipt raises very serious practical considerations. Most taxpayers rely on written receipts as proof of their expenditures, and the government ordinarily honors such receipts. The fact remains, however, which supposedly is known to everyone, that the law permits falsity, fraud, or other legal infirmity to be proven in appropriate circumstances as to any written instrument, whether it be a will, deed of conveyance, contract, release, or receipt. Obviously, it is unlikely that Rosenbaum's receipt would have been challenged but for the attendant circumstances which have been recited. And once challenged, the falsity of the receipt in this particular criminal prosecution had to be proven beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. After hearing all the proof in a fourteen day trial, the Court below categorically stated that he did not believe appellant's testimony and thus found both that no substantial payment was made to Rosenbaum and the receipt was false.

■ In tax evasion cases, as in all other criminal prosecutions, guilt may be established beyond a reasonable doubt by circumstantial evidence, United States v. Woodner, 2 Cir., 1963, 317 F.2d 649; Swallow v. United States, 10 Cir., 1962, 307 F.2d 81, cert. den. 371 U.S. 950, 83 S.Ct. 504, 9 L.Ed.2d 499, reh. den. 372 U.S. 925, 83 S.Ct. 718, 9 L.Ed.2d 731; United States v. Doyle, 7 Cir., 1965, 234 F.2d 788, cert. den. 352 U.S. 893, 77 S.Ct. 132, 1 L.Ed.2d 87. It is elementary that a verdict of guilty, whether at the hands of court or jury, is not to be overturned

unless there is no substantial evidence to support it, Newsom v. United States, 5 Cir., 1964, 335 F.2d 237; Curtis v. United States, 5 Cir., 1961, 297 F.2d 639, cert. den. 369 U.S. 838, 82 S.Ct. 867, 7 L.Ed. 2d 842, and numerous other cases which are digested in Criminal Law ☞1159 (2)i, West's Modern Federal Practice Digest. Of course, the precedents are replete with instances in which, after thorough consideration of the evidence, viewed in the light most favorable to the government, appellate courts have concluded that the evidence did not support the conviction. In the present exercise of this serious responsibility we must consider not only direct testimony of positive facts but also all inferences which the trial court might reasonably have drawn from those facts, Ah Ming Cheng v. United States, 5 Cir., 1962, 300 F.2d 202. The circumstances proven must lead to the conclusion with reasonable certainty and must be of such probative force as to create basis for legal inference and not mere suspicion, Wesson v. United States, 8 Cir., 1949, 172 F. 2d 931. In the absence of direct proof, the circumstances relied upon to sustain a conviction must not only be consistent with guilt but inconsistent with every reasonable hypothesis of innocence, Barnes v. United States, 5 Cir., 1965, 341 F.2d 189.

■ Upon mature reflection, without recapitulating in detail that which has already been stated of the circumstances of this case, we are inexorably compelled to the view that there was substantial evidence to support the findings of the trial court, especially when we consider that he observed the demeanor of the witnesses and expressly stated that he did not believe the testimony of the appellant that the money was paid to Rosenbaum and a true receipt obtained therefor.

In general, this case is quite analogous to that of *Woodner*, supra, in which a conviction was affirmed in the Second Circuit, but the circumstances go much further in such particulars as: (1) the desire of the appellant, expressed from the beginning, to collect $60,000 of this

commission in currency; (2) the refusal of his messenger to give a receipt for the money; (3) appellant's expressed concern over the presence of witnesses at the delivery of the cash; (4) his inquiry as to how the payments were reflected on the books of the borrower; (5) his statement that this could not be allowed to stand; (6) his statement that such disbursements should be handled by making small withdrawals by checks and depositing the proceeds in a safe deposit box; (7) his efforts in 1961 to obtain a back-dated contract in writing which would support his position in the matter; (8) his inability to explain why he wanted the $60,000 in cash, although he had first offered the explanation that the cash was for Rosenbaum, who, by his own contention, was not to receive over half that amount; (9) the secreting of part of the proceeds in his attic; (10) the failure to enter the receipt of the cash on his office journals, although the checks were entered; and (11) his obtaining the back-dated receipt from Tobin. See United States v. Eley, 7 Cir., 1963, 314 F.2d 127; United States v. Mollet, 2 Cir., 1961, 290 F.2d 273; and Holt v. United States, 9 Cir., 1959, 272 F.2d 272.

■ 2. Appellant earnestly complains of the testimony admitted as to the impecunious, or "penurious", condition of Rosenbaum in 1960. He says that this amounted to a "species of reverse net worth—but without the safeguards insisted upon in net worth prosecutions". Of course, this was a prosecution of Cohen, not Rosenbaum. We agree that failure to pay bills, debts, and taxes may not necessarily be proof of poverty. It is common knowledge that some people do make a persistent practice of not paying, even when they have the funds. They prefer to hoard the money rather than to pay their obligations. We think, however, in the context of this case, this evidence was relevant as a part of the over-all circumstances of the case. We are of the further opinion that admitting this proof could not and does not

constitute reversible error for the reason that if this testimony had been entirely rejected there would yet remain substantial evidence of guilt. In fact, the Trial Court specifically states that Rosenbaum's penurious condition was not the sole basis for his belief that Mr. Cohen did not pay him the money.

3. Is there any merit in appellant's contention that by jointly indicting Rosenbaum as an aider and abettor the government illegally made Rosenbaum unavailable as a witness and thus conferred immunity upon appellant? We think not.

■ In his brief, appellant states his point: "The government may not prosecute an individual whom it deprives of his defense to the accusation it makes," and " * * * Rosenbaum's critical testimony was made unavailable, first by the prosecution, which caused Rosenbaum to be indicted as an aider and abettor (but not as a co-conspirator) * *." If Rosenbaum had been on trial with Cohen as a co-defendant then he could not have been called as a witness on Cohen's behalf, United States v. Housing Foundation of America, 3 Cir., 1949, 176 F.2d 665. But there had been a severance and Rosenbaum was not on trial. Apparently severance had been granted to comply with the rule later stated in United States v. Echeles, 7 Cir., 1965, 352 F.2d 892. At the beginning of the trial, there was discussion as to whether either the government or the defendant would call Rosenbaum. Neither did. The government is privileged not to call a witness in whom it has no confidence and is under no duty to present evidence for the defense, Cendella v. United States, 1 Cir., 1955, 224 F.2d 778, cert. den. 350 U.S. 901, 76 S.Ct. 179, 100 L.Ed. 791. True, the government had the burden of proving the falsity of Rosenbaum's receipt but it could choose to undertake it without calling Rosenbaum. The defense could have called Rosenbaum. The choice not to do so was no doubt the product of the careful strategy of outstandingly able counsel who

represented Cohen. For one thing, it might have been considered best not to submit Rosenbaum to cross examination. It might have been thought, with reason, that one who habitually failed to pay his own taxes would not be a very powerful witness for one under a like accusation. In any event, we think the whole matter dissolves when it is remembered that had Rosenbaum been called he could immediately have invoked his constitutional privilege against self-incrimination regardless of whether he was or was not under indictment. At any rate, the defense could not preserve the point, if there is one, by simply assuming unavailability. By the above discussion we do not mean to infer that if the government chooses to try any particular defendant it must be careful not to jointly indict others who are also subject to indictment for participation or complicity in the same offense.

4. There was no error in the denial of the motion for a new trial. This motion rested on the newly discovered evidence that certain witnesses had heard Rosenbaum admit he received the $30,000. Leaving aside any question of the hearsay character of this evidence, it was proven at the trial that Rosenbaum had twice admitted in writing that he received the money. Hence, the District Judge was within permissible discretion when he held the evidence to be cumulative and denied the motion, Reno v. United States, 5 Cir., 1965, 340 F.2d 307.

Able counsel in a thorough brief have raised other points. They have been carefully considered, but they avail nothing toward the reversal of this judgment.

Nor have we ignored the fact that there was direct, positive evidence to the effect that Mr. Cohen understated his 1960 income by $4,500, which he did not pay until 1961 and which he attempted to cover by a back-dated receipt from Tobin.

The Judgment is affirmed.