UNITED STATES of America
v.
James Allen BARBER, Appellant in 18304 et al.

Appeal of Warren Hilman MOWBRAY, Appellant in No. 18305.

Appeal of Robert TATE, Appellant in No. 18306.

Appeal of Steven Eric WHITE, Appellant in No. 18307.

Appeal of Manuel Teddy BRUNSWICK, Appellant in No. 18309.

Appeal of Allan STEED, Appellant in No. 18310.

Appeal of William H. ROBINSON, Appellant in No. 18311.

Nos. 18304–18307 and 18309–18311.

United States Court of Appeals, Third Circuit.

Argued Oct. 26, 1970.

Decided April 14, 1971.

William Prickett, Prickett, Ward, Burt & Sanders, Wilmington, Del., for James Allen Barber.

Wilfred J. Smith, Jr., Wilmington, Del., for Warren H. Mowbray.

Arthur J. Sullivan, Wilmington, Del., for Robert Tate.

L. Coleman Dorsey, Wilmington, Del., for Steven E. White.

Louis L. Redding, Wilmington, Del., for Manuel T. Brunswick.

Ernest S. Wilson, Jr., Wilmington, Del., for Allan Steed.

David T. Dana, III, Wilmington, Del., for William H. Robinson.

Norman Levine, Asst. U. S. Atty., Wilmington, Del., F. L. Peter Stone, U. S. Atty., for appellee.

Before McLAUGHLIN, FREED-
MAN * and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

Before us are seven appeals from convictions resulting from an attack upon two agents of the Federal Bureau of Investigation.[1] The four-count indictment charged the defendants with (1) assault, or aiding and abetting an assault, with a dangerous weapon (a shoe) upon special agent Frank W. Grant, in violation of 18 U.S.C. § 111; (2) assault, or aiding and abetting an assault, upon special agent James D. Snyder, also in violation of § 111; (3) conspiring to prevent these agents from performing their duties, in violation of 18 U.S.C. § 372; and (4) assisting their prisoner, Robert Barber, to escape, in violation of 18 U.S.C. § 752. Following a three-week trial, the jury returned the following verdicts on the charges against the present appellants.

| Defendant | Count 1<br>Assault with a dangerous weapon upon Grant | Count 2<br>Assault upon Snyder | Count 3<br>Conspiring to prevent agents from performing their duties | Count 4<br>Assisting in escape |
|---|---|---|---|---|
| James Allen Barber | Guilty to lesser offense of assault | Guilty | Guilty | Guilty |
| Warren Hilman Mowbray | Guilty as charged | Guilty | Guilty | Guilty |
| Robert Tate | Guilty to lesser offense of assault | Not guilty | Guilty | Guilty |
| Steven Eric White | Not guilty | Not guilty | Guilty | Guilty |
| Manuel Teddy Brunswick | Not guilty | Guilty | Not guilty | Guilty |
| Allan Steed | Guilty as charged | Not guilty | Guilty | Guilty |
| William H. Robinson | Guilty as charged | Guilty | Guilty | Guilty |

From the multitude of arguments pressed and considered in these consolidated appeals, we have decided that the following questions deserve detailed discussion and analysis:

1. Was there sufficient evidence to sustain the various convictions?

2. Was there a proper instruction on identification?

3. Were defendants deprived of due process by being denied a fair trial by an impartial jury free from outside influence?

4. Did the district court abuse its discretion in denying the several motions for severance?

This court has previously discussed the facts giving rise to the indictment:

> The record shows that during the afternoon of October 29, 1968, special agents Frank Grant and James Snyder of the Federal Bureau of Investigation

* Judge Freedman participated in the consideration of this case but died before this opinion was filed.

1. Thirteen defendants were charged under the indictment, and their cases were consolidated for trial. The district court directed a verdict of not guilty in favor of one defendant at the close of the government's case. The jury acquitted three others. The conviction of a fifth defendant was reversed by this court in United States v. Barber (Appeal of Loper), 429 F.2d 1394 (1970). One defendant did not appear for trial. Pretrial proceedings are reported at 303 F. Supp. 807 (D.Del.1969), 296 F.Supp. 795 (D.Del.1969), and 297 F.Supp. 917 (D.Del.1969).

engaged in a search for an Army deserter in Wilmington, Delaware. The alleged deserter was apprehended in the home of his mother at 2209 Pine Street, Wilmington, at approximately 3:30 p. m. As the agents left the house with their prisoner and turned up Pine Street toward their car on Twenty-second Street, a group of approximately fifteen men walked down Pine Street toward them and came face to face with them at or near the corner of Twenty-second and Pine. The agents walked to within five feet of the group and stopped briefly. Grant removed his credentials from his pocket, held them out before him and stated, "F.B.I. We have a man in custody. Make room for us to pass." The group was informed that the prisoner was a deserter being returned to the Army, and warned that anyone interfering would be arrested for assaulting a Federal officer. Immediately after saying this, the agents proceeded forward and were attacked by several individuals from the group.[2] In the course of the affray, which lasted only a few minutes, agent Grant was knocked down and kicked severely on the side of the face and the prisoner escaped.

429 F.2d 1394, 1395 (1970). Footnote 2 states: "The testimony indicates that three or four persons assaulted each officer." To these facts we add that the record indicates that while agent Grant was knocked down and kicked, agent Snyder was seized upon, punched, and forcibly spread across the hood of an automobile.

## I

█ We have no difficulty in concluding there was sufficient evidence to sustain the convictions of appellants Barber and Mowbray. Barber's uncle testified that Barber was fighting with agents Grant and Snyder. Grant positively identified Barber as being in front of the group approaching them. Debbie Price identified Barber and Mowbray as actually doing the fighting, and said

Mowbray and Brunswick were holding the arms of one of the agents while Barber was hitting him. Howard Faulkner stated that Barber and Mowbray were in "the bunch of boys" who assaulted the agents.

Catherine Butler Wright testified that Mowbray was punching the agent who was on the ground (Grant). Dora Faulkner said Mowbray forced Snyder across the hood of a black car, "bending him back." Howard Faulkner placed Mowbray with Barber when agent Grant was kicked in the head. Mrs. Caroline Parker saw Mowbray standing over Grant. In sum, there was ample evidence to support convictions of Barber and Mowbray on all counts of the indictment involving, and arising from, the actual assaults on both agents, and the subsequent escape of their prisoner.

Similarly, we are satisfied that the conviction of appellant Robinson must be upheld. Agent Snyder testified that Robinson was standing in front of him and that he pushed Robinson up to the wall because

> [a]t that time I thought that was the guy that had me around the neck. * * * While at the time I pushed him toward the wall and told him to put his hands up and stay there, he put his hands up and stood towards the wall facing the wall, but he had his head turned toward me looking at me. And I had drawn my service revolver. And simultaneously with this I was hit from behind and picked up in the air. And the person I have identified as Robinson turned off the wall and came toward me. And I was held up in the air. And I remember I tried to hit him with my service revolver. And the next thing I remember I was on the hood of a car, spread out on the hood of a black car that was parked on the opposite side of Twenty-second Street that the bureau automobile was parked.

Debbie Price placed Robinson in the fight although she identified him by name as "Steven White." Twilly McCready identified Robinson as one of the

men kicking the agent who was on the sidewalk (Grant).

Appellant Steed, also known as "Bop Daddy," was acquitted of the Snyder assault but found guilty on Counts 1, 3 and 4. Catherine Wright identified him as one of the men in the group. As a hostile witness she conceded that "Bob Daddy" had been fighting agent Grant. Debbie Price also said Steed was doing the fighting, and that he was holding Grant on the ground, "holding his legs, holding the ankles." Charles Price testified that Steed and Mowbray were beating Grant and that Steed was punching and kicking.[2]

Steed argues that Charles' direct testimony is completely without inculpatory force because Charles did not name him as one of the four attackers of Grant he identified in a written statement to the F.B.I. on the night of October 29. After testifying that Steed's name was not on the list given to the F.B.I., he was asked on cross-examination:

> Q. Is it still your testimony, Charles, that at no time did you see more than four men beating on or fighting with the F.B.I. agent on the northwest corner of 22nd and Pine Streets?
> A. Yes.
> Q. Only four?
> A. Yes.
> Q. And the four men's names are listed in this statement, is that correct?
> A. Yes.

In approaching this contention, we take as a starting point the settled principle that "[i]t is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts." Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944); see also Renault v. L. N. Renault & Sons, 188 F.2d 317 (3 Cir. 1951). Even where the different parts of a witness' testimony are inconsistent, "it is for the jury to reconcile the conflicting statements and determine which shall prevail." Greene v. City of Philadelphia, 279 Pa. 389, 392, 124 A. 134, 135 (1924); Luckenbach v. Egan, 418 Pa. 221, 210 A.2d 264 (1965).

These are cases which hold that "when a witness says in one breath that a thing is so, and in the next breath that it is not so, his testimony is 'too inconclusive, contradictory, and uncertain to be the basis of a legal conclusion.' "[3] But even those cases in which the court has been permitted to invade the jury's exclusive province of determining credibility, the justification appears to be based on the determination that the inconsistencies and contradictions of the witness' testimony are so glaring that "no fair minded man could balance it and find it true,"[4] and that, accordingly, no factual dispute remains over which reasonable men could differ.

In addition, in considering the effect of a prior, extrajudicial statement of a

---

2. (T 937)
> Q. And who was beating on the agent?
> A. Allan Steed.
> Q. Allan Steed. Had you known Allan Steed before this day?
> A. Yes.
> Q. About how long did you know him?
> A. Since before I moved over there.
> \* \* \* \* \*
> Q. \* \* \* Can you tell us a little more of actually what Allan Steed was doing?
> A. He was punching and kicking the man in the side.

3. Voss v. City of Baltimore, 246 Md. 345, 228 A.2d 295, 298 (1967); Eisenhower v. Baltimore Transit Co., 190 Md. 528, 59 A.2d 313, 318 (1948). But see Crawford v. Lumbermen's Mut. Cas. Co., 126 Vt. 12, 220 A.2d 480, 483 (1966).

4. Hebert v. Boston & M. R. R., 90 N.H. 324, 8 A.2d 744, 749 (1939). Even in this case the court recognized the general proposition that "with very few exceptions a trier of facts may accept some parts and reject other parts of the testimony of a witness, and may adopt one or the other of inconsistent statements of the witness." *Id.*

witness, it must be borne in mind that such statements are generally admissible for the purpose of demonstrating " 'a defect either in the memory or in the honesty of the witness.' " [5] Where a witness is not a party, the statement is received for impeachment purposes only, to demonstrate " 'the repugnancy of his evidence.' " [6] It is not received assertively or testimonially as substantive evidence to show affirmatively its truth as against that of the in-court statement, but solely for the purpose of setting before the jury two self-contradictory statements, both of which cannot be correct.[7] It is the sworn testimony received in open court which rises to the dignity of substantive evidence, having affirmative testimonial value.

Steed contends that Charles Price's "yes" reply on cross-examination to questions whether only four men were fighting and whether the four men's names were listed in the F.B.I. statement amounted to both a complete repudiation of Price's direct testimony and affirmative substantive evidence.

■ We are not persuaded that the cross-examination constituted such a disavowal of the direct examination as to remove Charles' direct testimony from the jury. His was not an unconditional recantation. The cross-examination consisted of leading questions, artfully and professionally phrased by a skilled advocate, and was designed to elicit monosyllabic affirmative answers by a thirteen year old boy. Significantly, no specific statement was extracted from the witness rejecting or withdrawing his testimony, given under oath in open court, that he saw Steed "beating on the agent" and "punching and kicking" him. We will not say that the trial judge erred in permitting the jury to assess the probative value of the testimony on both direct and cross-examination. We conclude that the collective evidence adduced by eye witnesses Catherine Wright, Debbie Price, and Charles Price constituted sufficient evidence to sustain a guilty verdict. Any conflict in the testimony was for the jury to resolve.

■ Turning to the conspiracy count, we recognize that one who aids in the commission of a crime is as responsible as if he committed the act directly. Nye & Nissen v. United States, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949). It was the theory of the government that this was a concerted effort, albeit somewhat spontaneous in plan and execution, to assist a neighborhood youth to escape from the custody of federal agents. The government proved concert of action that did not come about by sheer coincidence. This, together with proof of the overt acts, was sufficient to sustain the conspiracy count convictions. *See* United States v. American Radiator & Stand. San. Corp., 433 F.2d 174 (3 Cir. 1970).

We are unable to conclude, however, that the evidence against the remaining three appellants, Brunswick, Tate and White, was sufficient to sustain the jury verdicts against them. Although acquitted of the Grant assault and conspiracy counts, Brunswick was found guilty of assault upon Snyder and assisting the prisoner to escape. Catherine Wright testified that Brunswick was trying to get at the agent on the ground (Grant) "with his hand." She and Debbie Price also said that Brunswick participated in the assault upon agent Grant. The only testimony implicating Brunswick in the Snyder assault came from Miss Price: "There was a car there and there was one man against the car. And he [there?] was three boys and with each on him [and] he [they?] was holding his arms * * * Mowbray, Barber, and Brunswick were holding him * * they were holding him and they had him

---

5. III A Wigmore on Evidence § 1017, at 993 (Chadbourn Revision, 1970).

6. *Id.* § 1018, at 995.

7. *Id.* at 995–96; Bridges v. Wixon, 326 U.S. 135, 153–154, 65 S.Ct. 1443, 89 L. Ed. 2103 (1945); Southern Ry. v. Gray, 241 U.S. 333, 337, 36 S.Ct. 558, 60 L.Ed. 1030 (1916); United States v. Schwartz, 390 F.2d 1 (3 Cir. 1968).

stretched out * * * Barber was the one who was hitting him." Standing alone, this testimony would have generated a jury question on the Snyder assault count. When considered with other testimony, however, including that of Miss Price, that Brunswick played an active role assaulting agent Grant at about the same time the assault on agent Snyder was being perpetrated, this fragment of testimony that Brunswick was "holding" "one man against the car," cannot, without a more specific identification of the "one man," be considered sufficient to sustain a conviction on Count 2.

We also conclude there was insufficient evidence to support a conviction on Count 4, assisting in the escape of the prisoner. Ernestine Barber, sister of the prisoner, testified that Brunswick arrived on the scene after the fight was over. Her testimony was that she saw Brunswick come home from work; he asked her where she was running and she hold him of the fight with the two agents which was then going on. She said Brunswick then walked to his house, where he remained for about five minutes. She picked up her boyfriend and thereafter saw Brunswick standing by a car in front of his house a block away from the scene. When she went back to the scene of the fight she did not see Brunswick. She said: "I didn't see him * * *. When I ran around there to where the agents was, he was standing outside the car [i e., his own car outside his house], but I didn't see him down on the corner until it was all over."

The evidence is that the prisoner escaped during the early assaults upon the agents. Because the jury found Brunswick not to have been a criminal actor in the conspiracy to prevent agents from performing their duties, it can be hypothesized that the jury accepted the testimony that he was a late entry upon the scene of the fray. When this is considered with the findings of the jury on one assault count, and of this court on the other, absolving him of criminal assault, their remains precious little evidence of probative value to support a verdict against Brunswick on Count 4.

As to Tate, Debbie Price testified on direct examination that he was holding Grant's feet, but she vacillated on cross-examination, and concluded she was not certain of the identification. The only other implicating witness was Carol White, who said that she saw Tate in the group of men approaching the agents. The testimony against White is equally inconclusive. Snyder said that he "strongly resembles someone he observed in the group." Witness McCready saw White run from the scene. Although Debbie Price testified that a person by the name of Steven White was in the fight, she made a courtroom identification of defendant William Robinson as the person she called Steven White.

The verdicts of conviction against appellants Brunswick, Tate, and White on the various counts will not be permitted to stand because the government failed to meet its burden of proving them guilty by proof beyond a reasonable doubt. United States v. Barber (Appeal of Loper), *supra;* Hendrix v. United States, 327 F.2d 971 (5 Cir. 1964); United States v. Garguilo, 310 F.2d 249 (2 Cir. 1962). As we previously held in reversing the conviction of another of the defendants in this case:

> The conduct of the individual charged or other special circumstances attending his presence must be such as to show that he has associated himself with and participated in the criminal undertaking. Something of significance beyond the fact of presence is necessary to justify a conviction. This requirement is an essential safeguard against the ever present danger of assuming the complicity of all in attendance whenever group activity is involved, and specially when many members of a group, actors as well as onlookers, are tried together.

United States v. Barber (Appeal of Loper), *supra,* 429 F.2d at 1397.

## II

The court charged on identification as follows:

Consider each witness' intelligence, age, motive and state of mind in demeanor and manner while on the stand. Consider the witness' ability to observe the matters as to which he or she has testified, and whether he or she impresses you as having an accurate recollection of these matters. Consider also any relation which each witness may bear to each side of the case, the manner in which each witness might be affected by the verdict and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

The accuracy of an identification of a particular defendant by a witness in this case must be determined from all the circumstances relating to that identification. In this connection, if you believe from all the evidence and circumstances pertaining to a particular defendant that there is reasonable doubt as to the accuracy of the identification and of that defendant as a participant in the acts charged on the indictment, then you must find him not guilty. On the other hand, if you find beyond a reasonable doubt from all the evidence and circumstances that the identification of that particular defendant as a participant in the acts charged in the indictment is accurate, then you must find him guilty.

Appellants urge that the entangled circumstances of this case compelled a more exacting charge to underscore the critical nature of the identification issue—that the commingling of participants and passersby in the vortex of a sudden mob scene rendered arduous and crucial the task of determining who did what to whom. Indeed, appellants contend that identification was the basic issue in this three-week long trial.[8]

██ Appellants' contention is not without appeal. An affray of such short duration, involving so many participants, affords but limited opportunities for witnesses to observe and to make positive identifications. Under such circumstances it would be desirable to include, at the very least, an instruction that identification testimony should be received with caution and scrutinized carefully. As Mr. Justice Brennan observed in United States v. Wade, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967):

The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.[6] Mr. Justice Frankfurter once said: "What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent—not due to the brutalities of ancient criminal procedure." The Case of Sacco and Vanzetti 30 (1927). [Footnote omitted.] [9]

However appropriate additional instructions would have been in the case at

---

8. Appellants argue that the following requested charge should have been given:

Testimony with respect to identification must be scrutinized with great care. The possibilities of human errors and mistakes and the similarity of many persons with one another are elements which you must take into consideration * * * I caution you very carefully to consider * * * methods of identification in great detail [from photographs, lineups, courtroom identifications]. * * * Especially where a witness claims to have identified a particular defendant when he had no familiarity with such defendant prior to the incident you must recognize that such a witness is expressing an opinion which may have formed in great haste and in circumstances of considerable excitement. * * *

9. Footnote 6 to the opinion cites the following authorities on the problem of eyewitness identification:

Borchard, Convicting the Innocent; Frank & Frank, Not Guilty; Wall, Eye-Witness Identification in Criminal Cases; 3 Wigmore, Evidence § 786a (3d ed. 1940); Rolph, Person Identity; Gross,

bar, we are, nonetheless, constrained to conclude that no reversible error was committed. The trial court relied on formidable precedential authority which holds that it is necessary neither to instruct the jury that they should receive certain identification testimony with caution, nor to suggest to them the inherent unreliability of certain eye-witness identification. In United States v. Moss, 410 F.2d 386 (3 Cir. 1969), for example, we said: "the trial judge was under no obligation to give * * * a special instruction" on the uncertainty and unreliability of identification testimony. In Cullen v. United States, 408 F.2d 1178 (8 Cir. 1969), the trial court was requested to charge "that testimony tending to prove identity is to be scrutinized with extreme care," and that "no class of testimony is more uncertain and less to be relied upon than that of identity"; on appeal, the court held the instruction properly refused because the trial court fairly instructed the jury as to the government's burden of proof and the facts to be considered by them before rendering a verdict. See also Barber v. United States, 412 F.2d 775 (5 Cir. 1969); McGee v. United States, 402 F.2d 434, 436 (10 Cir. 1968).[10]

In our function as a reviewing court, therefore, we hold that there was no trial error in the identification charge.[11] In the exercise of our supervisory power over the trial courts in this judicial circuit, however, we believe that the time has come to require new dimensions to jury instructions on identification.

■ We recognize initially the primary rule of evidence that a witness ought to state only those facts of which he has personal knowledge. "The law requires that he who deposes to a fact should have the means of knowing it." State v. Allen, 1 Hawks 9 (1820). In identification evidence, what the witness represents as his knowledge must be an impression derived from his own senses.[12] And this impression must be gauged by the geographic proximity of the witness to the event, the length of time involved, and the existence of proper conditions for the exercise of powers of observation and perception. However, the "result of the witness' observation need not be positive or absolute certainty * * *; it suffices if he had the opportunity of personal observation and did get some impressions from this observation."[13] "'The indefiniteness and un-

Criminal Investigation 47–54 (Jackson ed. 1962); Williams, Proof of Guilt 83–89 (1955); Wills, Circumstantial Evidence 192–205 (7th ed. 1937); Wigmore, The Science of Judicial Proof §§ 250–253 (2d ed. 1937). See also Quinn, In the Wake of Wade:
The Dimensions of Eyewitness Identification Cases, 42 U.Colo.L.Rev. 135 (1970) in which the author, Colorado's Assistant State Public Defender, asserts that the major cause of wrongful convictions is not the use of confessions, but the use of eye-witness identifications.

10. Furthermore, the suggested charge on identification of defendants contained in Devitt & Blackmar, Federal Jury Practice and Instructions, is expressed in the following skeletal form:
The evidence in this case raises the question of whether the defendant was in fact the criminal actor and necessitates your resolving any conflict or uncertainty in testimony on that issue.
The burden of proof is on the prosecution with reference to every element

of the crime charged and this burden includes the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime charged.

11. Thus, we put aside the question whether the requested instruction failed to meet the requirements of Fed.R.Crim. Pro. 30. The requested identification instruction was submitted in the form of one lengthy instruction by counsel for a defendant later acquitted. Other counsel, including those for all the appellants, appear to have joined in the request.

12. II Wigmore on Evidence, § 657 at 762 (3d Ed. 1940).

13. Id., § 658 at 768 (emphasis omitted). Where on cross-examination the witness said the defendant looked like the criminal actor but that the witness might be mistaken, it was held that refusal to strike the testimony was not error; the question was one of credibility not admissibility. United States v. Morabette, 119 F.2d 986 (7 Cir. 1941).

certainty in the testimony, of course, affects [sic] its weight.' " [14]

■ Eye-witness identification testimony, therefore, is an expression of a belief or impression by the witness. If there is a high degree of precision and certainty in his expression, which is consistent with any prior statements and unshaken on cross-examination, the statement of the witness may be regarded as a statement of fact. If certainty is lacking, the expression is deemed to possess an evidentiary quality of inferior rank.[15] Thus, where the circumstances surrounding the criminal act gave limited opportunity for observation or utilization of other sensory perception, or where uncertainty is expressed by the witness himself, or exposed by a past history of the witness' statements or demonstrated by cross-examination, the statement of identity should be considered as only an expression of opinion and should be accompanied by appropriate instructions as to its sufficiency and weight. To be sure, the courts have been generous in the admission of eye-witness identification in order to permit the jury to make its own assessment. The emphasis has been on inclusion of evidence, rather than exclusion; on credibility, rather than admissibility.[16]

We recognize that the trial courts are invested with wide discretionary power in the selection of appropriate language in jury instructions. Conceptually, this discretion is justified because the instructions should be addressed to the specific evidence adduced at trial and the law under which the case is tried. We detect, however, an increasing reliance upon form language for jury instructions—"trial-tested and appellate-approved." We note the use in many states of what have come to be known as "Pattern Jury Instructions." [17] While such resources may be useful for the purpose of supplying guidelines to the trial courts, we believe that instructions to the jury must be molded to fit the fac-

14. Commonwealth v. Kloiber, 378 Pa. 412, 424, 106 A.2d 820, 827 (1954), quoting 2 Wharton's Criminal Evidence, § 932 at 1626. Professor Wigmore defined identity as "the quality of sameness with another person or thing. The essential assumption is that two persons or things are first thought of as existing, and that then the one is alleged, because of common features, to be the same as the other." II Wigmore on Evidence, § 411 at 385 (3d Ed. 1940).

15. Opinion of any kind is a poor quality of evidence, and where admissible at all it is only so because it is the best that is available. In all questions of competency on that subject there must be a sliding scale, the only standard of which is that the witness shall have such knowledge of the subject-matter as can be reasonably expected in view of the circumstances of the particular case. Whitekettle v. N. Y. Underwriters Inc. Co., 293 Pa. 385, 143 A. 129, 130.
Gerhard v. Boston Ins. Co., 99 F.Supp. 247, 249 (E.D.Pa.1951).

16. Balancing the liberal admissibility of identification evidence is the commensurately heavy burden placed upon the prosecution of proving the identity of the criminal actor by proof beyond a reasonable doubt. Where identity is placed in issue, the trial court is required to charge the jury on this high degree of proof. United States v. Levi, 405 F.2d 380 (4 Cir. 1968); Jones v. United States, 124 U.S.App.D.C. 83, 361 F.2d 537 (1966); Gregory v. United States, 125 U.S.App. D.C. 140, 369 F.2d 185, 190–191 (1966).

17. A recent compilation by The Institute of Judicial Administration indicates that courts in at least 36 states use some form of pattern jury instructions. Other states have indicated interest in, or are presently circulating, standard instructions. Those states in which there is significant use of pattern jury instructions include:

| | |
|---|---|
| Alabama | Nevada |
| Alaska | New Hampshire |
| Arizona | New Jersey |
| Arkansas | New Mexico |
| California | New York |
| Connecticut | North Carolina |
| Florida | North Dakota |
| Illinois | Ohio |
| Indiana | Oregon |
| Iowa | South Dakota |
| Kansas | Tennessee |
| Kentucky | Texas |
| Michigan | Utah |
| Minnesota | Virginia |
| Mississippi | Washington |
| Missouri | West Virginia |
| Montana | Wisconsin |
| Nebraska | Wyoming |

tual complex of each case. An instruction approved in one case, or indeed in many similar cases, may not be sufficient for the particular case at bar if the comparative circumstances are not identical or substantially similar.

■■■ Consequently, while we endorse the wide latitude to be accorded the trial courts in the area of jury instructions, we recognize a compelling need for guidelines which will obviate skeletal, pattern instructions and assure the essential particularity demanded by the facts surrounding each identification. Accordingly, we approve for use in this circuit the approach taken by the Pennsylvania courts concerning jury instructions on identification, and require, for prospective application only, that such instructions satisfy the following:

> In any case raising the question whether the defendant was in fact the criminal actor, the jury will be instructed to resolve any conflict or uncertainty on the issue of identification. The jury will be instructed that identification may be made through the perception of any of the witness' senses, and that it is not essential that the witness himself be free from doubt as to the correctness of his opinion. The identification testimony may be treated by the jury as a statement of fact by the witness: (1) if the witness had the opportunity to observe the accused; (2) if the witness is positive in his identification; (3) if the witness' identification testimony is not weakened by prior failure to identify or by prior inconsistent identification; and (4) if, after cross-examination, his testimony remains positive and unqualified. In the absence of any one of these four conditions, however, the

jury will be admonished by the court that the witness' testimony as to identity must be received with caution and scrutinized with care.[18] The burden of proof on the prosecution extends to every element of the crime charged, including the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime for which he stands charged.

### III

■■■ Appellants Mowbray, Barber, and Steed urge that the trial court's refusal to grant a change of venue, in view of the widespread publicity concerning the incident, constituted a denial of appellants' right to due process of law by depriving them of a fair trial by an impartial jury free from outside influence.[19] We disagree.

At the trial, which was held almost six months after the incident occurred, the trial judge asked the 96 veniremen on *voir dire* whether they had read about the case. Forty-eight had. Each was then asked if he had formed any opinions about the case and, if so, whether he could decide the case solely on the evidence. Only two felt they could not so decide, and were promptly excused by the court. Only one prospective juror said he had formed an opinion about the Wilmington Youth Emergency Action Council (WYEAC)—an organization with which appellants had been allegedly associated, and one which had been identified with violence and had become the subject of a United States Senate Subcommittee Investigation into the use of anti-poverty funds.[20] In ruling on the motion the trial court stated:

> [I] am not convinced that the publicity of the incident was so massive, per-

18. See Commonwealth v. Kloiber, 378 Pa. 412, 424, 106 A.2d 820, 826–827, cert. denied, 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954); Commonwealth v. Wilkerson, 204 Pa.Super. 213, 218, 203 A.2d 235, 237 (1964).

19. Prior to trial the court denied (a) the motion of appellant White for a change of venue, severance and inspection of reports of special agents Grant and Snyder, 296 F.Supp. 795 (D.Del.1969); (b) the

motions of appellants Mowbray, Tate and Robinson for severance; and (c) Robinson's motions for change of venue and for discovery of names, addresses and signed statements of witnesses' statements and reports of agent Grant and statements and reports of agent Snyder, 297 F.Supp. 917 (D.Del.1969).

20. Appellants argue that there was a strong community hostility against them as a group because the incident occurred

vasive, inflammatory, and prejudicial as to effect either joint or separate trials * * * With regard to the newspaper publicity, defendants have submitted thirteen articles extending over a six month period from the two daily newspapers published in Wilmington. From some 300 daily papers printed during this period, the defendants offer only 13 articles and claim an "abnormal amount of sensational" commentary.

296 F.Supp. at.800–801.

Appellants' principal reliance is upon Sheppard v. Maxwell, 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966): "where there is reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." The *Sheppard* case also outlines the scope of judicial review of the denial of this type of motion: "appellate tribunals have the duty to make an independent evaluation of the circumstances." *Id.* at 362, 86 S.Ct. at 1522. Upon our own independent review of the entire record, we conclude that appellants failed to show the presence of a citizenry so inflamed as to require a change of venue under Rule 21(b) Fed.R.Crim.Pro.[21]

## IV

We turn finally to the question whether the appellants were prejudiced by the joint trial. In the words of the district court:

Generally speaking where several defendants are jointly indicted they should be tried together, particularly where the charges against them arise out of joint acts allegedly committed by each in the presence of each other. In such cases, joint trials are favored in the interest of conserving judicial economy, avoiding duplicitous, time-consuming and expensive trials, conserving public funds, diminishing inconvenience to witnesses and public authorities, and promptly trying those accused of crime.

United States v. Barber, 296 F.Supp. at 797, citing Hall v. United States, 83 U.S.App.D.C. 166, 168 F.2d 161, cert. denied, 334 U.S. 853, 68 S.Ct. 1509, 92 L.Ed. 1775 (1948); Kilgore v. United States, 323 F.2d 369, 371 (8 Cir. 1963), cert. denied, 376 U.S. 922, 84 S.Ct. 681, 11 L.Ed.2d 617 (1964); Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); United States v. Kahaner, 203 F.Supp. 78 (S.D.N.Y.1962), affirmed 317 F.2d 459 (2 Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963).

Denial of severance is not a ground for reversal on appeal unless clear prejudice and abuse of discretion is shown. Johnson v. United States, 356 F.2d 680 (8 Cir. 1966). Our review of the record does not disclose a showing of such abuse or prejudice. The argument of appellant Barber that denial of severance prohibited him from calling his co-defendants as witnesses in his behalf has been answered by this court in United States v. Housing Foundation of America, 176 F.2d 665 (3 Cir. 1949), holding that a defendant may not compel another defendant to take the stand.[22]

---

at a time of racial tension in the community when the city was being patrolled by National Guard units, and because many of the defendants were allegedly former employees of WYEAC.

21. We note, *inter alia*, that the trial court acquitted David Smoke at the close of the government's case, and that the jury acquitted Roland Thomas Johnson, James Alfred Staats, and Robert Bolden on all counts, found Brunswick and White not guilty on two counts, and found Tate and Steed not guilty on one count.

22. It would appear axiomatic that the constitutional right of a defendant not to testify at the behest of a co-defendant remains his right despite the severance of their trials. Thus, although a defendant may be entitled to call a co-defendant, United States v. Bronson, 145 F.2d 939, 943 (2 Cir. 1944), the co-defendant has the right to refuse to testify, United States v. Carella, 411 F.2d 729, 731 (2 Cir. 1969). But see Cohen v. United States, 363 F.2d 321 (5 Cir. 1966). Indeed, comment by one defendant's attor-

Moreover, the mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating another have both been held to be insufficient grounds to require separate trials. Dauer v. United States, 189 F.2d 343 (10 Cir. 1951).

We have carefully considered all the other arguments advanced by the various appellants and conclude that they are without merit.

We hold that the evidence on all counts against Robert Tate, Steven Eric White and Manuel Teddy Brunswick was insufficient as a matter of law for jury consideration. Their judgments of conviction will be reversed and they will be discharged.

The judgments of conviction in the cases of James Allen Barber, Warren Hilman Mowbray, Allan Steed and William H. Robinson will be affirmed.

Hays, Circuit Judge, dissented and filed opinion.

ney on the refusal of another defendant to take the stand may result in reversible error as to the latter defendant's conviction, Coleman v. United States, 137 U.S.App.D.C. 48, 420 F.2d 616 (1969); United States v. Housing Foundation, *supra*. Barber could not have compelled testimony by a co-defendant, then, even if a severance had been granted. United States v. Arcuri, 405 F.2d 691, 695 (2 Cir. 1968).