**UNITED STATES of America**
**v.**
**Allen John BAMBERGER, Appellant in No. 71–1114, et al.**
**Appeal of Donald Eric CRAPPS.**
**Appeal of Roger ELAM.**
**Appeal of Randall Phillip YOUNG.**
**Nos. 71–1114 through 71–1117.**

United States Court of Appeals,
Third Circuit.

Argued Dec. 7, 1971.

Decided Feb. 17, 1972.

Joel A. Murphy, Mills, Doyle, Hock & Murphy, Morristown, N. J., for Allen John Bamberger.

Richard M. Fishkin, Fishkin & Feltman, Hackensack, N. J., for Donald Eric Crapps.

Kent A. Losche, Losche & Losche, Hackensack, N. J., for Roger Elam.

Thomas W. Dunn, Wittman, Anzalone, Bernstein & Dunn, Hackensack, N. J., for Randall Phillip Young.

John J. Barry, Asst. U. S. Atty., Newark, N. J. (Herbert J. Stern, U. S. Atty., Newark, N. J., W. Hunt Dumont, Asst. U. S. Atty., on the brief,) for appellee.

Before HASTIE, ALDISERT and JAMES ROSEN, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

These are consolidated appeals from judgments of conviction entered on jury verdicts finding appellants guilty of bank robbery.[1] Although many contentions are urged, and all have been carefully considered, we deem it important to discuss the identification issue raised by appellants Bamberger and Crapps, the admissibility of evidence question raised by Elam, and the sufficiency of the evidence issue raised by Elam and Young.

During a daylight robbery of the Hackensack Trust Company, Saddle Brook, New Jersey, on March 6, 1969, some $67,000 was taken by four armed and masked men. Although one of the tellers activated the bank's surveillance cameras, none of the bank's employees or customers could identify the robbers because their faces were covered. John Morrow, employed by the post office next door to the bank, was informed by a passerby that a robbery was in progress. He telephoned the police and, observing through the post office window, saw three men emerge from the bank and enter a brown Oldsmobile, in which a driver was waiting. Morrow described these four men as Negro males, and testified that he acquired a frontal view of one of the robbers when a white handkerchief which had been shielding the man's face slipped. He made an in-court identification of this man as Bamberger. Although cross-examined by five defense counsel, Morrow did not waiver from the positive identification he made on direct examination.

Police officer Chester Cebula testified that while he was driving a police cruiser two blocks from the bank, he received a radio call to be on the alert for four Negro males in the vicinity. When he saw a brown automobile containing five Ne-

---

1. The appellants and one Ronald Reed were found guilty of robbery of a federally insured bank, and putting lives in jeopardy by use of dangerous weapons. 18 U.S.C. § 2113(a), (d) and 18 U.S.C. § 2.

gro males leave the bank's parking lot, he began to follow it, and radioed his position and the car's license number to police headquarters. He stated that the brown car pulled to the curb and stopped and two men emerged, one from either side, and both began firing their weapons at his car, twenty feet behind. Cebula was hit by one of several bullets which penetrated his windshield. He testified that he lay down on the front seat with his head toward the passenger side while more shots entered the car from that side. He identified Crapps as the man who fired five or six times from the passenger side and identified Bamberger as the other gunman. This identification is the basis of the appeals by Bamberger and Crapps.

The next day, agents of the Federal Bureau of Investigation, acting upon information described by them as reliable, obtained an arrest warrant for Elam, then known as "Roger, last name unknown, a/k/a Rahmann." When Elam was arrested that day at his home, agents seized certain recent purchases of clothing, later introduced into evidence. A former fellow-inmate of Elam's, one Riviello, testified that Elam told him that he participated in planning and executing the bank robbery. It is the admissibility of this evidence and testimony which forms the basis of Elam's appeal.

The same day, F.B.I. agents proceeded to 55 Chancellor Avenue, Newark, to arrest Young. They forced their way into a second floor apartment. Young was not on the premises but was later taken into custody. Whether the evidence seized at 55 Chancellor Avenue—a substantial amount of cash, including certain bait money traceable to the robbed bank—was sufficient to sustain Young's conviction forms the basis of his appeal.

## I. Appeal of Bamberger, No. 71–1114

Appellant Bamberger contends that his conviction should be reversed because the identification testimony, although properly admissible, did not rise to a quality sufficient to sustain a verdict; alternatively, he seeks a new trial on the theory that certain items seized in California at the time of his arrest were improperly admitted into evidence.

Morrow made a positive in-court identification of Bamberger as "the last man to emerge from the bank." Morrow testified that he had the opportunity to observe Bamberger for two or three seconds after a "white shield" or something "like a white handkerchief . . . seemed to drop down," affording him a clear view of Bamberger's face. Morrow stated that he was interviewed by F.B.I. agents on three occasions—two days after the robbery, about a month and a half prior to trial, and shortly before the trial began. During the second and third of these interviews, he was shown approximately fifteen photographs, but was not asked for, nor did he give, an identification of Bamberger or of any one of the bank robbers.

Bamberger seems to claim that this pretrial photographic display was unnecessarily suggestive or conducive to misidentification. Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L. Ed.2d 1247 (1967), teaches that questions concerning the propriety of pretrial photographic displays are to "be evaluated in light of the totality of the surrounding circumstances." 390 U.S. at 383, 88 S.Ct. at 970. See also United States v. Shannon, 424 F.2d 476 (3d Cir. 1970). Upon examination of the facts in this case, we are persuaded that Morrow's exposure to the photographic display was not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384, 88 S.Ct. at 971. Indeed, as in United States v. Conway, 415 F.2d 158, 159 (3d Cir. 1969), we find "the total absence of suggestiveness" in the conduct of these photographic displays.

Officer Cebula identified Bamberger as being "on the left-hand side of the police car firing his shots." On cross-examination, Cebula was asked a series of specific questions concerning

the exact location of Crapps and Bamberger during the siege of the police cruiser:

Q. What was their position alongside your cruiser when you made a positive identification of these individuals?

A. I only saw Donald Crapps alongside the right front window, the passenger side window.

Q. Where was Mr. Bamberger at this time?

A. I don't know.

Q. Then actually you said just a minute ago, did you not, that you couldn't identify two individuals as they came out of the car?

A. I saw two individuals.

Q. You only saw Mr. Crapps by the window, but you didn't see Mr. Bamberger?

A. I saw both individuals when they first emerged from this car.

Q. And I specifically asked you, sir, at that time could you make a positive identification, and you answered no, did you not, just two minutes ago? Am I correct?

A. Yes.

Q. Now, I ask you, who came to the side of the cruiser, that passenger side, and began pumping bullets at you?

A. Donald Crapps.

Q. Where was Mr. Bamberger at this time?

A. I didn't see him.

Q. Then in God's name, how, if you don't even know that, how do you know Bamberger was even in Bergen County that day?

A. I don't know.

Bamberger contends that these facts elicited on cross-examination constituted a complete recanting of Officer Cebula's identification testimony, and that, therefore, we should apply the doctrine referred to in United States v. Barber, 442 F.2d 517, 522 (3d Cir. 1971), that when a witness says in one breath that a thing is so, and in the next breath that it is not so, his testimony is "too inconclusive, contradictory, and uncertain to be the basis of a legal conclusion." However, here, as in Charles Price's testimony in *Barber,* we do not agree that there was a recanting of Cebula's identification testimony. Following the above colloquy, Officer Cebula reaffirmed his identification testimony during redirect examination:

Q. Officer, are you sure that the two men which you picked out in court yesterday were the same two men that fired at you on March 6, 1969?

A. Positive.

Q. Absolutely positive?

A. Yes, sir.

Thereafter, although Cebula was subjected to additional cross-examination by Bamberger's counsel, this positive identification testimony was not altered. It is incontrovertible that such positive eyewitness identification testimony is of the fabric required to sustain the verdict in this case.

Bamberger and appellant Crapps contend further that Cebula's in-court identification testimony was tainted by his pretrial exposure to photographs of appellants. On March 8, 1969, two days after the robbery, while still in the intensive care unit following his wounding, Cebula was shown photographs of fourteen or fifteen men. He then said that he could "possibly" identify Bamberger and Crapps. The next day, he was again shown the group of photographs. During the trial, he recounted:

I just told them those were the ones (Bamberger and Crapps) . . . that shot me.

Q. Are you sure?

A. Positively.

Q. Are you sure to this day?

A. Yes.

Q. Did either of those two [police lieutenant and F.B.I. agent] in-

dividuals pick those two photographs out for you?

A. No, sir.

Q. Did they suggest to you in any way that these were the two individuals that might have shot you?

A. No, sir.

Q. Are you sure?

A. Positive.

 At this time, March 9, 1969, neither Crapps nor Bamberger was in custody. Crapps was arrested on March 11 and Bamberger on March 17. As in the case of Morrow's testimony, we find that Officer Cebula's identification of Crapps and Bamberger was not the product of an impermissibly suggestive pretrial photographic display.

 Finally, Bamberger argues that items taken from him at the time of his arrest in California were improperly admitted into evidence.[2] Bamberger had in his possession a driver's license bearing his photograph but a fictitious name, expensive clothes bearing Miami labels, a piece of paper upon which were written names and monetary amounts approximating the loot from the bank robbery, and a second piece of paper upon which were written three telephone numbers corresponding to Fort Lauderdale, Florida, airline reservations offices. The court instructed the jury that this evidence was:

a circumstance which may tend to prove consciousness of guilt and should be considered and weighed by you members of the jury in connection with all the evidence. The weight to be given evidence of flight depends upon the motive that prompted it and all the surrounding circumstances.

Indeed, in United States ex rel. O'Connor v. New Jersey, 405 F.2d 632, 638 (3d Cir. 1968), cert. denied sub nom. Yeager v. O'Connor, 395 US. 923, 89 S. Ct. 1770, 23 L.Ed.2d 240 (1969), this court suggested that an accused's flight and concealment "may be circumstantially relevant to prove both the commission of the act and the intent and purpose with which it was committed." Citing Embree v. United States, 320 F.2d 666, 668 (9th Cir. 1963).

We hold that the introduction of this evidence satisfied the requirements of admissibility and relevancy, and will affirm the conviction of appellant Bamberger.

II. Appeal of Crapps, No. 71–1115

Appellant Crapps seeks a new trial because, he contends, the verdict was the result of "prejudice and passion, not the evidence." As support for this thesis, he maintains that Officer Cebula's identification testimony was "unreliable," that the testimony of Detective Grimes[3] was insufficient, that the jury was in-

---

2. We note that the arrest of Bamberger and the seizure of these items were lawful. Bamberger does not deny that entrance into the California premises was gained after Bamberger's wife executed a written consent-to-search form. During this search, Bamberger was found hiding in a closet under a pile of dirty clothes, and was arrested pursuant to a warrant issued seven days before. This court has held that a wife who has an equal right to possession of a home may consent to a search. United States ex rel. Cabey v. Mazurkiewicz, 431 F.2d 839, 842–843 (3d Cir. 1970). See also Coolidge v. New Hampshire, 403 U.S. 443, 484–489, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); United States ex rel. McKenna v. Myers, 232 F.Supp. 65 (E.D.Pa.1964), aff'd., 342 F.2d 998 (3d Cir.), cert. denied, 382 U.S.

857, 86 S.Ct. 111, 15 L.Ed.2d 95 (1965). Bamberger does not argue, and the record does not disclose, that Mrs. Bamberger did not have an equal right of possession to the premises.

3. Detective Otis Grimes testified that he recognized Crapps from a picture of one of the robbers carried in the Newark Star-Ledger. Grimes testified that he spoke with Crapps for approximately ten minutes about three weeks before seeing this picture. He stated that although the picture showed a man with a hat and a sweatshirt pulled up over his nose, he recognized that man as Crapps. On cross-examination, however, Grimes took the position that this picture "resembled" Crapps.

flamed because of the introduction into evidence of Officer Cebula's bloody clothing and the bullet-splattered windshield of the police cruiser, and that the in-court "unfortunate demeanor of the defendants themselves, their actions and continuous interruptions, . . . climaxed by defendant Bamberger's grabbing and eating" of a slip of paper which constituted a government exhibit, were all prejudicial to his cause. Finally, he contends that a "prejudicial atmosphere was initially created by the placement of these five black men on trial, with the miniscule evidence the Government had against them for a crime obviously committed by five black men."

■ We will quickly dispose of the identification argument. Although the testimony of Detective Grimes in itself possibly may not have sustained a conviction, the testimony of Officer Cebula identifying Crapps as the gunman who emerged from the Oldsmobile he was following and who shot at him was sufficient, and, as we have heretofore observed, admissible. What we said in Barber, supra, is applicable here:

> In approaching this contention, we take as a starting point the settled principle that "[i]t is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts." Tennant v. Peoria & P. U. Ry. Co., 321 U. S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944); see also Renault v. L. N. Renault & Sons, 188 F.2d 317 (3 Cir. 1951).

442 F.2d at 522.

We find that the jury could properly have reached this verdict on the basis of Officer Cebula's testimony.[4]

■ The admissibility of Cebula's shirt and bullet-ridden windshield is a determination within the discretion of the trial judge. United States v. Skillman, 442 F.2d 542, 551-552 (8th Cir. 1971); United States ex rel. Dixon v. Cavell, 284 F.Supp. 535, 539 (E.D.Pa. 1968). It is error to admit such evidence, however, when it serves no legitimate purpose and the only effect is to inflame the minds of the jurors. Suhay v. United States, 95 F.2d 890, 894 (10th Cir.), cert. denied, 304 U.S. 580, 58 S. Ct. 1060, 82 L.Ed. 1543 (1938).

■ We find no abuse of discretion here. Both the shirt and the windshield were evidence of the armed assault on Officer Cebula.[5] Moreover, defense counsel extensively cross-examined Cebula as to the positions he assumed after the bullet struck him, and also as to his physical condition immediately following the wounding. We find that both the shirt and the windshield were relevant and material to the inquiry, and we cannot say, as a matter of law, that any prejudicial effect of these items outweighed their probative value. Eagleston v. United States, 172 F.2d 194, 200, 12 Alaska 213 (9th Cir.), cert. denied, 336 U.S. 952, 69 S.Ct. 882, 93 L.Ed. 1107 (1949).

We view Crapps' argument that the various disruptive displays of other defendants prejudiced his right, as a "passive" defendant, to a fair trial, as a suggestion that his trial should have been severed from that of the others, at least from that of Bamberger and Young.[6]

4. "[I]t is well established at common law . . . that ordinarily the testimony of one eyewitness is sufficient for the purpose of identification of the perpetrator of a crime." United States v. Levi, 405 F.2d 380, 382 (4th Cir. 1968). See also United States v. Johnson, 412 F.2d 753, 756 (1st Cir. 1969), cert. denied, 397 U.S. 944, 90 S.Ct. 959, 25 L.Ed.2d 124 (1970); 7 Wigmore on Evidence § 2034, at 259.

5. "Pistols, fruits of the crime, clothing, parts of the body of the person killed, everything pertaining to the crime which will aid the jury in its consideration of the (alleged) crime and the guilt or innocence of the accused, is admissible". This has been the law for centuries. Commonwealth v. Novak, 395 Pa. 199, 150 A.2d 102, 108 (1959).

6. Young made the following outbursts, *inter alia:* "white people carry us through this

■ We find no error in the court's decision to conduct a consolidated trial, and conclude that if there resulted any prejudice from the actions of Young and Bamberger it inured to the detriment of the participating defendants only and not to the passive ones. Moreover, in instructions to the jury, the court meticulously explained that a separate consideration of the evidence against each accused was required. This court has stated:

Generally speaking where several defendants are jointly indicted they should be tried together, particularly where the charges against them arise out of joint acts allegedly committed by each in the presence of each other. In such cases, joint trials are favored in the interest of conserving judicial economy, avoiding duplicitous, time-consuming and expensive trials, conserving public funds, diminishing inconvenience to witnesses and public authorities, and promptly trying those accused of crime.

United States v. Barber, *supra*, 442 F.2d at 529.

■ Assuming that Crapps did make a motion for a mistrial and a severance —and we are not at all certain that such motions were made following the

outbursts—we are not convinced that the court erred in allowing the joint trial to proceed. Courtroom outbursts and disruptions, lately occurring with increased frequency, although regrettable and deplorable, cannot be seized upon in and of themselves as justifications for retrials. "If such conduct by a co-defendant on trial were held to require a retrial it might never be possible to conclude a trial involving more than one defendant; it would provide an easy device for defendants to provoke mistrials whenever they might choose to do so." United States v. Aviles, 274 F.2d 179, 193 (2d Cir.), cert. denied sub nom. Evola v. United States, 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960).

■ This issue presents a delicate balancing of the right of a passive co-defendant to have his cause determined in an atmosphere free of inflammatory speech and gesture, society's interest in speedy trials for those accused of crime, the realities of sound judicial administration, and a consideration of convenience to witnesses. The accommodation of these countervailing considerations is entrusted to the trial judge. So long as he accords the necessary protection to the passive defendant within the parameters of sound judicial discretion we should not disturb his decision. We find no abuse of discretion here.[7]

---

mock justice. And the judge sitting up there acting all dignified, with his mess;" "we didn't have nothing when you came to pick us up 400 years ago and put us in chains. It ain't no different today, you are the same devils, braggarts, braggarts, braggarts." In open court, he called F.B.I. agent Keogh a liar, and branded F.B.I. agent Childers an "arch-liar." Bamberger continually interrupted the testimony of F.B.I. agent Hale, and climaxed this activity by swallowing government exhibit G–77.

7. A supplemental *pro se* brief filed by Crapps asks that his sentence be vacated and the cause remanded to the district court for re-sentencing. He contends that the sentencing court erred in not finding affirmatively that appellant, as a youth offender under twenty-two years of age at the time of sentencing, 18 U.S.C. §

5006, "may not be able to derive maximum benefit from treatment by the [Youth Correction] Division," 18 U.S.C. § 5010(c). He argues that 18 U.S.C. § 5010(d) requires such a finding by the court before another sentence, in excess of six years, may be imposed: "(d) If the court shall find that the youth offender will not derive benefit from treatment under subsection (b) or (c), then the court may sentence the youth offender under any other applicable penalty provision." Appellant's reliance on Carter v. United States, 113 U.S.App.D.C. 123, 306 F.2d 283 (1962), and Brisco v. United States, 246 F.Supp. 818 (D.Del.1965), is misplaced. Neither case supports the suggested point. Indeed, "the purpose of Congress in passing [the Federal Youth Corrections Act] was to make available for the *discretionary* use of federal judges a system for the sentencing and treat-

III. Appeal of Elam, No. 71–1116

Elam presents two lines of argument on appeal. His counsel contends that the conviction should be reversed on the ground of insufficient evidence because (1) evidence obtained as a consequence of an illegal arrest was admissible, and (2) the testimony of Riviello was insufficient to sustain a conviction. In addition, Elam, *pro se,* submits a number of other contentions, among which is the request for a new trial because the judge committed "reversible error by refusing to permit appellants' counsel to inquire in *voir dire* examination whether any of the prospective jurors were prejudiced against black people." [8]

We reject Elam's *voir dire* argument because the record belies his contention. We recognize that it is reversible error for a trial court to refuse, upon proper request, an inquiry of prospective jurors as to the existence of racial prejudice. Aldridge v. United States, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931) ; United States v. Carter, 440 F. 2d 1132 (6th Cir. 1971) ; United States v. Gore, 435 F.2d 1110 (4th Cir. 1970) ; Frasier v. United States, 267 F.2d 62 (1st Cir. 1959). See also United States v. Napoleone, 349 F.2d 350 (3d Cir. 1965) ; United States v. Finkley, 450 F. 2d 1082 (3d Cir. 1971). We hasten to add, however, that the trial judge has wide discretion in determining what questions should be asked during *voir dire,* and it is the sole function of this court to ascertain whether that discretion has been abused. United States v. Owens, 415 F.2d 1308, 1315 (6th Cir. 1969), cert. denied, 397 U.S. 997, 90 S. Ct. 1138, 25 L.Ed.2d 406 (1970).

Our own independent examination of the *voir dire* proceedings discloses no abuse of discretion by the trial court. Indeed, counsel for Young asked members of the panel whether their schools were "integrated with colored children"; whether they belonged to any organization "whether fraternal or what-have-you, which is opposed in any form to busing colored children to school"; whether any had "been involved with any type of altercation, molestation, . . . either yourselves personally, your relatives or your friends with any colored people"; or any crimes involving Negroes.

Elam's counsel asked whether any juror "feels or believes that the Black Muslim religion is anything but a religion," and asked whether they had any comments or any questions asked them "by all the attorneys so far." Bamberger's attorney asked a prospective juror, "Is the fact that the defendants are black and are Black Muslims—of the Black Muslim religion—would this in any way affect your application to this case?" Moreover, after lengthy interrogation, Elam's counsel announced to the court that the jury as constituted was "satisfactory."

Elam was arrested pursuant to an arrest warrant issued by a federal magistrate. As part of a search incident to the arrest the government seized a quantity of newly purchased clothing; two pairs of imported Stetson leopard skin shoes, at a selling price of $139.95 per pair, a third pair selling at $99.95, a $115 leather jacket, and a hat and suit. Testimony concerning the seizure of these articles was received in evidence. Although ostensibly this evidence was relevant to the issue of guilt by showing "sudden unexplained acquisition of wealth by an impecunious person at or

---

ment of youth offenders. . . ." United States v. Lane, 284 F.2d 935, 941 (9th Cir. 1960) (emphasis supplied). See also Smearman v. United States, 279 F. Supp. 134 (W.D.Pa.1968). We hold that the court did not err in imposing a sentence in excess of six years on a convicted bank robber who fired into the windshield of a pursuing police cruiser, and then proceeded deliberately to the side of the car and pumped bullet after bullet into the vehicle for the sole purpose of seriously wounding or killing the police officer inside.

8. Elam also argues (1) lack of probable cause for his arrest, (2) improper introduction of evidence of other crimes, (3) insufficient evidence to sustain a conviction, and (4) "inadequate instruction."

about the time of a theft which he had an opportunity to commit," United States v. Chaney, 446 F.2d 571, 575 (3d Cir. 1971), there was no instruction to the jury on this point. Moreover, appellant made no objection to the admission of this evidence at trial and made no request for an instruction that the jury disregard it. On appeal he raises the admissibility issue for the first time, arguing first, that the seizure of the evidence offended his fourth amendment rights because the warrant for his arrest was not supported by a sufficient affidavit of probable cause, and second, that the government failed to lay the requisite groundwork by showing he was impecunious.

On March 7, 1971, a warrant, government exhibit G–75, was issued for the arrest of each defendant, including one for "Roger, last name unknown, a/k/a Rahmann." Application was made by an F.B.I. agent whose affidavit disclosed that a "confidential informant, who has given reliable information to the Federal Bureau of Investigation in the past, which has led to five convictions and two additional arrests in cases still pending trial, all of which were armed robbery cases," contacted the F.B.I. within three hours after this bank robbery, and prior to release by the news media of details of the robbery, that the informant said the named co-defendants had just robbed a bank in Saddle Brook, and that he had been present at a specific apartment with them, heard them discuss the robbery, and had seen "two pillow cases filled with money, four automatic rifles, and hand guns."

■ This affadivit falls well within the standard enunciated in Aquilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), requiring "that an affidavit based solely on the hearsay report of an unidentified informant must set forth 'some of the underlying circumstances from which the officer concluded that the informant . . . was "credible" or his information "reliable".' " United States v. Harris, 403 U.S.

573, 576–581, 91 S.Ct. 2075, 2078, 29 L. Ed.2d 723 (1971). The affidavit here contains the same allegations of prior reliability as were found acceptable in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), which the Court in *Harris* termed a "suitable benchmark." 403 U.S. at 580, 91 S.Ct. 2075. We hold that the warrant authorizing Elam's arrest was supported by a sufficient affidavit of probable cause as required by the fourth amendment and, therefore, was valid. See also United States v. Schartner, 426 F.2d 470, 473 (3d Cir. 1970).

For his second argument, Elam relies on the rule in this circuit that the government must first present the requisite foundation proof that the accused was an impecunious person prior to introducing evidence of a sudden unexplained acquisition of wealth. United States v. Chaney, *supra;* United States v. McKenzie, 414 F.2d 808 (3d Cir. 1969); United States v. Howell, 240 F.2d 149, 158 (3d Cir. 1956). In the cases which articulate or reaffirm this requirement, however, a timely objection was made at the offer of proof. Thus, it is significant that in the instant case Elam interposed no objection to the introduction of evidence of a sudden unexplained acquisition of wealth.

More precisely put, therefore, the question devolves to this: may trial counsel stand mute at trial, interposing no objection at the introduction of evidence, and have the admissibility challenged for the first time on appeal?

■ "The general rule, of course, is that alleged errors in a jury trial which are not brought to the attention of the trial court will not be considered on appeal. United States v. Atkinson, 297 U.S. 157, 56 S.Ct. 391, 80 L.Ed. 555 (1936)." Kuzma v. United States Rubber Co., 323 F.2d 657, 658 (3d Cir. 1963). Certainly where the evidence has been rendered absolutely inadmissible by statute, or is of such a character that it could not, under any circumstances, have been properly admitted, the admissibility *vel*

*non* can be properly noted on appeal on the basis of plain error.[9] But other considerations obtain where, as here, no constitutional overtones are present [10] and the attack is directed simply to the formalities of laying a proper foundation for its reception. The experiences of any practitioner at the trial bench or bar, criminal or civil, attest to the prevailing practice of receiving routine evidence without the necessity of laying the proper foundation, *e. g.*, medical and hospital bills, business records, X-ray films, the presentation of physical evidence without prior proof of a perfect chain of custody. Ordinarily in such cases it is only when an objection is lodged that foundation proof becomes an issue. As a matter of trial strategy, often the adverse party does not desire an imposing foundation to introduce the substantive testimony, *e. g.*, in the reception of opinion testimony from an expert with formidable national or international credentials. In the instant case, counsel's failure to object could be interpreted as deliberate trial strategy to minimize the inferences drawn from the purchase of $139.95 shoes.

■■■ The courts have often said that a party may not sit by silently, take his chances on a verdict, and, if it is adverse, then complain of a matter which, if error, could have been eradicated during the trial if brought to the attention of the court or one's adversary in a proper and timely fashion. See cases cited in Zeman v. Borough of Canonsburg, 423 Pa. 450, 223 A.2d 728, 729–730 (1966). "[T]he burden is on the defendant to take his objection at the earliest possible opportunity when, by doing so he can enable the trial judge to take the most efficacious action. Holden v. United States, 388 F.2d 240, 242–243 (1st Cir. 1968)." Saville v. United States, 400 F.2d 397 (1st Cir. 1968), cert. denied, 395 U.S. 980, 89 S.Ct. 2137, 23 L.Ed.2d 768 (1969). See also Good v. United States, 378 F.2d 934 (9th Cir. 1967).

■■ Therefore, we do not reach the merits of the foundation argument. Where, as here, the considerations do not rise to constitutional dimensions, we should not depart from the salutary practice followed where no timely objections are lodged to jury instructions. See United States v. Chicarelli, 445 F.2d 1111, 1115 (3d Cir. 1971) and cases collected therein.[11]

■■■ We hold that under the instant circumstances, where no instruc-

9. Wright, Federal Practice and Procedure, § 856, at 372–373:

Courts have endeavored to put a gloss on the rule by defining the kind of error for which they can reverse under Rule 52(b). Thus it is said that "plain error" means "error both obvious and substantial," or "serious and manifest errors," or "seriously prejudicial error," or "grave errors which seriously affect substantial rights of the accused." Perhaps these attempts to define "plain error" do not harm, but it is doubtful whether they are of much help. The sounder perception is that when an appellate court should take notice of an error not raised below must be made on the facts of the particular case, and there are no "hard and fast classifications in either the application of the principle or the use of a descriptive title." Indeed the cases give the distinct impression that "plain error" is a concept appellate courts find impossible to define, save that they know it when they see it.

10. Courts appear to be more willing to find clear error when it is of constitutional dimension. See, *e. g.*, United States v. Nikrasch, 367 F.2d 740, 743–744 (7th Cir. 1966); Alexander v. United States, 390 F.2d 101 (5th Cir. 1968); Hall, Modern Criminal Procedure, at 1260.

11. See United States v. Sytch, 257 F.2d 475 (3d Cir. 1958) (unobjected to calculations of an F.B.I. agent which assumed materials were not purchased by a school); Hickey v. United States, 208 F.2d 269, 279 (3d Cir. 1953), cert. denied, 347 U.S. 919, 74 S.Ct. 519, 98 L.Ed. 1074 (1954) (unobjected to evidence in a condemnation proceeding which had not taken depreciation into account: "The assignment will not be considered as constituting reversible error since it lacks the foundation of an objection in the court below").

See also Proposed Rules of Evidence for United States Courts and Magistrates, Rule 103, Rulings on Evidence (a). The Advisory Committee notes: "Subdivision

tion was requested or given as to the relevancy of the seized goods, it was not clear error under Fed.R.Crim.P. 52(b) to receive this evidence. There being no timely objection at trial, the absence of proper foundation testimony is not reviewable on appeal.

One Teddie Riviello, incarcerated with Elam in the county jail prior to trial, testified that Elam told him of his involvement in the bank robbery:

Q. THE COURT: Was anything said with respect to any robbery for which he was then confined?

A. Well, the one I am referring to is this charge that they had him on in the bank robbery. This is the one that we had been discussing right along, or the one I am discussing right along, that he discussed with me.

Riviello testified that Elam told him that he and others met several times to plan the robbery, and that he taught the younger men how to use automatic weapons.[12] He told Riviello the details of the pursuit by Officer Cebula, how the "cop . . . started going down after them and as they went to get in the car there, they stopped the car, they got out, they turned around and they shot at the policeman with an automatic gun. . . . They shot and then a couple of men had went back to make sure of the shooting and went back and shot him on both sides of the windows of the car to make sure thay had shot the cop again, to make sure he couldn't continue chasing them."

The thrust of Elam's attack on this testimony is (1) in Riviello's recital Elam did not admit participation in the robbery; (2) there was much vague testimony of irrelevant activities of Elam; and (3) Riviello was promised leniency for cooperating with the prosecutor.

■■■ There is no merit to these contentions. As we have observed, Riviello said he was talking about this particular bank robbery. Appellant overlooks the reality that even if, at best, Riviello's testimony did not make Elam a direct participant, it made him an aider and abettor under 18 U.S.C. § 2. Testimony of other activities was introduced in cross-examination, despite a warning by the court, for the purpose of attacking Riviello's credibility. In sum, the value of the witness' testimony was for the jury. It was fairly and properly presented.

Having considered each argument advanced by Elam, both by counsel and by *pro se* brief, we will affirm the judgment of conviction.

## IV. Appeal of Young, No. 71–1117

Appellant Young raises two basic points: (1) insufficiency of evidence; and (2) a sixth amendment right of confrontation question relating to Riviello's testimony which tangentially made reference to him. In the view we take, it is necessary to reach only the first issue.[13]

The case against Young must stand or fall on the items of evidence seized at an apartment at 55 Chancellor Avenue.[14]

(a) states the law as generally accepted today. Rulings on evidence cannot be assigned as error unless (1) a substantial right is affected, and (2) the nature of the error was called to the attention of the judge, so as to alert him to the proper course of action and enable opposing counsel to take proper corrective measures." 51 F.R.D. 315, 323–324.

12. Riviello testified:
The fellows that was involved [Elam] says, was all his crew and they have to turn around and listen to what he tells them and the other fellow tells them.

13. We note, however, that because the trial court, by explicit instruction, limited the scope of Riviello's testimony, that testimony may not be considered as evidence of Young's guilt:
Members of the jury, I want to instruct you that when this witness refers, it is, as I understand to Mr. Elam and no one else. [Do] [y]ou understand?

14. The seizure is described in the government's brief:
On March 7, 1969, Special Agent Reep of the F.B.I. along with other Bureau agents of the Newark office proceeded to a residence located at 55

The government's case is predicated on a long standing rule of circumstantial evidence which permits a jury, upon proof of unexplained possession of freshly stolen property, to draw the inference that the possessor is the thief.[15] This is

Chancellor Avenue, Newark, to arrest Randall Young and to search the premises pursuant to an arrest and search warrant.

The agents, upon arriving at the above address, announced themselves, and when no one responded to their knock, forced their way into a second-floor apartment. They first searched the apartment for Young but he was not present. Agent Reep went into the bedroom and in the top drawer of a bureau located seven thousand dollars ($7,000) in loose currency. The currency was in one stack but segregated as to the different denominations.

Agent Reep identified in court the seven thousand dollars ($7,000) in currency which he discovered on March 7 and seized as evidence. The currency (subsequently put in five packets) was comprised of 14 fifty dollar ($50) bills, 150 twenty dollar ($20) bills, 100 ten dollar ($10) bills, 14 one hundred dollar ($100) bills, and finally, 9 one hundred dollar ($100) bills [sic]. The last packet was "bait" money.

Agent Reep, in court, compared a bait list with the serial numbers of the nine one hundred dollar ($100) bills and the numbers on the list matched those on the bills. The bait list had been obtained by the F.B.I. from Stanley Zielezienski, Assistant Security Officer of the bank, on the previous day.

Mr. Zielezienski had previously identified the list in court and testified that some six thousand dollars ($6,000) in bait money had been discovered missing after the robbery. He testified that six packets of ten one hundred dollar ($100) bills had comprised the bait money found missing from six tellers' drawers that day.

On top of a bureau in the apartment in which the holdup money was found and in the bureau drawers, Agent Reep found numerous documents. They were:

(1) Two checks payable to Muhammad's Mosque bearing the signature, "Randall P. Young";

(2) Three other checks with same signature;

(3) Bank statement dated January 16, 1968 on the account of Randall P. Young, 129 Chancellor Avenue, Newark;

(4) A check book containing several blank checks for Randall P. Young;

(5) Form W-2 for employee, Randall P. Young, for year 1968;

(6) Birth certificate for Randall P. Young;

(7) Two letters sent to Randall Young (one bearing address of 129 Chancellor Avenue and return address of 51 South 13th Street, postmarked January 10, 1968; the other addressed to Young in care of Mrs. Young, 51 South 13th Street, and postmarked February 19, 1969);

(8) Two business cards in name of Randall P. X. Young, Shabazz Sundries, 410 Hawthorne Avenue, Newark; and

(9) A group photograph with the defendant Young included.

In the bedroom where the bureau was located, and in the bureau drawers, Agent Reep observed various articles of male and female clothing, including men's jackets and underwear. While Agent Reep was present, several females arrived, including one Jacqueline Wade.

While Agent Reep was in the apartment, Agents Keogh and Frank arrived in the vicinity and placed the apartment under surveillance. At approximately 11:00 p. m., they observed a car containing several persons park in front of that address. No one got out of the vehicle and after fifteen to twenty minutes elapsed, the car proceeded to the intersection of Bergen Street, whereupon the F.B.I. pulled it over. The occupants, defendants Young, Reed and Elam were arrested and transported to Newark office of the F.B.I. for questioning.

Keogh testified that he searched Young and found, among other things, two receipts, one for two pairs of shoes priced at one hundred and thirty-nine dollars and ninety-five cents apiece from a store in New York City and the other dated February 12, 1969 and made out to "Wade, 55 Chancellor Ave., G-E phono checkout estimate."

15. "Possession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and, though only *prima facie* evidence of guilt, may be controlling weight, unless explained by the circumstances or accounted for in some way consistent with innocence." Wilson v. United States, 162 U.S. 613, 619, 16 S.Ct. 895, 898, 40 L.Ed. 1090 (1896).

a classic example of the acceptable common law rule that an element of a crime may be proved with a "presumed" fact by establishing another fact, the basic fact.

Properly stated the rule is:

If the defendant is in possession of recently stolen property, an inference of fact, some times called a rebuttable presumption of fact, arises that he has stolen the property.

1 Wharton, Criminal Evidence § 135 (12th ed. 1955).[16]

There must first be proof of the basic facts: that the property was in fact identified as that which was stolen; next, there must be added the consideration of time, or the closeness of the discovery to the occurrence of the theft. Given the identity of that which was stolen and proximity in time, the presumption of fact is conceptualized on the hypothesis that it can be reasonably concluded that, without sufficient explanation, there is a likelihood that the person in possession was involved in the theft. Without proof of the equally basic fact of possession, however, there can be no reasonable justification for the inference.

For without possession, there is no rational basis for applying the laws of probability or likelihood, the sole justification under human experience "in the ordinary affairs of life," Regina v. Exall, 4 F. & F. 922 (1866), for the inference. Simply stated, the inference of guilt is justified only in the presence of factors which suggest the probability that the person could not have obtained possession in any way other than by theft.

The fatal deficiency in the government's case lay in its failure to prove actual or constructive possession of the bait money by Young. There being no proof of actual possession by Young, it was incumbent upon the government to prove constructive possession. Their efforts took the form of an attempt to show that Young lived at the address where the money was found. Because

---

United States v. Minieri, 303 F.2d 550, 554 (2d Cir.), cert. denied, 371 U.S. 847, 83 S.Ct. 79, 9 L.Ed.2d 81 (1962).

16. The use of this sort of evidence goes back as far as any in our law; for in the earlier system of Germanic law the possession of goods stolen gave rise to a peculiar and particularly speedy mode of procedure unfavorable to the accused. In modern times the fact of recent possession is also given a procedural effect, in that it casts upon the defendant the duty of producing an explanation, in default of which the case may be closed adversely to him.

I Wigmore on Evidence § 152, at 599. We note, however, that the concept of statutory presumptions has come under recent scrutiny from the Supreme Court. Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970); Leary v. United States, 395 U.S. 6, 36, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969). Indeed, in Leary, the Supreme Court found that "a criminal statutory presumption must be regarded as 'irrational' or 'arbitrary,' and hence unconstitutional, unless it can at least be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend." 395 U.S. at 36, 89 S.Ct. at 1548. In charging a jury, therefore, a court should be wary of the use of the term "presumption" without an accompanying explanation capable of lay comprehension. See United States v. Sherman, 171 F.2d 619 (2d Cir. 1948). Cf. Proposed Federal Criminal Code, Final Draft, § 103 (4):

When a statute establishes a presumption, it has the following consequences:

(a) when there is sufficient evidence of the facts which gave rise to the presumption, the presumed fact is deemed sufficiently proved to warrant submission of the issue to a jury unless the court is satisfied that the evidence as a whole clearly negates the presumed facts;

(b) in submitting the issue of the presumed fact to a jury, the court shall charge that, although the evidence as a whole must establish the presumed fact beyond a reasonable doubt, the jury may arrive at that judgment on the basis of the presumption alone, since the law regards the facts giving rise to the presumption as strong evidence of the fact presumed.

there was no direct proof of this fact, the government attempted to establish it by another inference, contending that because certain of Young's personal items were found on the premises, it was proper to conclude that he lived there. Here, too, a rational basis between the fact proved and the desired inference is required.

Although personal items belonging to Young were found in the apartment, we find that this evidence was insufficient to support the suggested inference that Young lived there. Found were a bank statement and a letter addressed to him at *129* Chancellor Avenue, Apartment D-6, Newark, not *55* Chancellor Avenue. His W-2 form showed an address of 51 South 13th Street. Business cards showed his business address to be 410 Hawthorne Avenue. And here, too, the test is probability or likelihood measured by human experience, in the ordinary affairs of life. Whether a given inference may properly be drawn is dependent upon the unique capabilities of those evidentiary facts rationally and logically required to support it. Thus, correspondence addressed to the accused at the instant premises would properly support an inference that he lived there, as would evidence of telephone or other utility registrations, or testimony that he was seen on the premises at the times and in the frequency associated with usual domiciliary habits. Therefore, we conclude that the government did not meet its burden of establishing Young's residence at 55 Chancellor Avenue. Without such proof there is no rational basis to invest him with actual or constructive possession of goods found there, specifically, the incriminating bait money. Without proof of possession, there can be no rational basis to the inference of guilt; and this being the sole incriminating evidence against Young, we hold that it was insufficient to sustain a conviction.

The judgments of conviction of Allen John Bamberger, Donald Eric Crapps, and Roger Elam will be affirmed. The judgment of conviction of Randall Phillip Young will be reversed and he will be discharged from custody.